Rafael GARCIA, Sr., Nivia Garcia Orozco, and Rafael Garcia, as personal representative of the Estate of Juan Carlos Garcia

v.

The UNITED STATES.

No. 97–6C.

United States Court of Federal Claims.

Jan. 27, 1998.

William J. Troy, Miami, FL, attorney of record for plaintiff.

Geoffrey C. Cook, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Lt. Col. David A. Anderson, Office of the Judge Advocate General, of counsel.

## OPINION

YOCK, Judge.

This military pay case is before the Court on the parties' cross-motions for judgment upon the record, pursuant to Rule 56.1 of the Rules of the United States Court of Federal Claims ("RCFC"). The defendant contends that the Board for Correction of Naval Records ("BCNR") properly declined the plaintiffs' request to change the deserter status of Airman Apprentice ("AA") Juan Carlos Garcia and that the United States is entitled to judgment upon the administrative record. The plaintiffs maintain that the BCNR decision denying their request was arbitrary, capricious, unsupported by substantial evidence, and contrary to law and that they are entitled to judgment upon the record. Oral argument was not requested and is deemed unnecessary. For the reasons set forth below, the Government's motion is granted and the plaintiffs' cross-motion is denied.

### Factual Background

On September 3, 1982, Juan Carlos Garcia, a Cuban citizen legally residing in the United States, enlisted as an airman apprentice in the United States Navy. On his Application for Enlistment, Juan Garcia listed "unknown" as the addresses of his parents. (Admin. R. at 50.)[1] In the "Remarks" section of the application, the Navy recruiter who enlisted AA Garcia noted that the new enlistee had lived with his grandmother since arriving in the United States from Cuba in 1971 and that Juan Garcia had not kept in contact with his parents "at all." (Admin. R. at 53.)

Upon completion of recruit training, AA Garcia was ordered to the USS Guadalcanal (LPH–7). He reported aboard the ship at Norfolk, Virginia, on January 4, 1983. On or about January 26, 1983, the vessel, with AA Garcia embarked, departed Norfolk to begin a deployment to the Mediterranean Sea.

The USS Guadalcanal is an amphibious assault ship. In addition to its crew of naval personnel, the ship berths a contingent of the United States Marines Corps. Helicopters carried aboard frequently are employed to transport marines and supplies between ship and shore. AA Garcia was assigned to a position in the mess division. This position provided him with frequent interaction with both sailors and marines and also gave him access to officer staterooms and laundered officer uniforms.

During the ship's transatlantic crossing, AA Garcia reportedly became angry when he discovered that he would not have an opportunity to visit Lebanon upon the ship's arrival at its station off the coast of Beirut. According to the sworn statement of a naval petty officer who worked with AA Garcia, AA Garcia stated that he was going to "jump ship" when the USS Guadalcanal arrived off Beirut. AA Garcia also reportedly said that he was going to join a Sandinista army in Beirut that would send him back to Cuba. The petty officer dismissed the comments at the time because he thought that AA Garcia was only joking.

By February 14, 1983, the USS Guadalcanal was on station in Beirut Harbor, Lebanon, approximately two miles from shore. On that day, according to the aforementioned sworn statement, AA Garcia repeated his desire to "jump ship." The petty officer asked AA Garcia if he planned to swim to shore. AA Garcia responded that the way off the ship would be to get in and out of one of the helicopters that flew from ship to shore. AA Garcia also reportedly opined to another friend aboard ship how easy it would be to fly off the ship in one of the helicopters.

Another shipmate, a naval airman who shared AA Garcia's living quarters, also made a sworn statement, relating that AA Garcia told him on or about February 14,

---

**1.** References to the Administrative Record will be designated as "Admin. R. at ———," with the page number referring to the number stamp at the bottom center of the page.

1983, that he was going ashore. According to the same sworn statement, AA Garcia also held Yasser Arafat in high esteem and stated that he would like to become a part of his organization.

Another naval petty officer, a naval fireman, and two marine lance corporals attested that on February 14, 1983, they heard AA Garcia say that he was going to go ashore. All four of the witnesses assumed that AA Garcia was only joking.

On the evening of February 14, 1983, AA Garcia and a naval seaman apprentice were assigned the task of distributing laundered uniforms to marine officers. The seaman apprentice attested that AA Garcia talked about going ashore to Beirut. According to the seaman apprentice, AA Garcia boasted that he would be walking on the streets of Beirut in the afternoon while the seaman apprentice "was still floating around on the Guadalcanal." (Admin. R. at 21.) AA Garcia was secured from laundry duty at or around 9:15 p.m.

From the evening of February 14, 1983, through the day of February 15, 1983, the USS Guadalcanal maintained a distance of at least two miles from shore. During that period, the vessel engaged in a major movement of personnel and cargo from ship to shore, utilizing both helicopters and small boats.

AA Garcia failed to report for muster on the morning of February 15, 1983. A search of the ship failed to locate him. Based on the aforementioned statements of sailors and marines aboard, the naval chief petty officer in charge of AA Garcia's division assumed that AA Garcia had "jumped ship." He ordered an inventory of the missing sailor's locker. The locker contained uniform items, personal letters, a wallet, and AA Garcia's active duty military identification card. Civilian clothes known to have been owned by AA Garcia were not in the locker. A naval first class petty officer found a pair of work boots, dungaree trousers, and a tee shirt near an aircraft elevator. The trousers and shirt were stenciled with the name "Garcia."

On February 16, 1983, the commanding officer of the USS Guadalcanal sent a message informing naval authorities that AA Garcia was a suspected deserter. The message related that AA Garcia was absent from the ship; that his work uniform was found near an aircraft elevator; that AA Garcia had made statements to shipmates to the effect that he would swim ashore or change into a Marine Corps utility uniform and fly ashore; that the USS Guadalcanal was engaged in extensive flight operations; and that military personnel ashore in Lebanon had been notified to be on the lookout for the missing sailor.

Later on February 16, 1983, the commanding officer dispatched another message, informing Naval authorities that further search of the ship and inquiry of personnel ashore failed to turn up the missing airman apprentice. The message summarized statements by crewmembers relating that AA Garcia had complained that members of the Lebanese Army had things better than sailors aboard ship. The message also informed officials that the commanding officer had declared AA Garcia to be a deserter as of February 15, 1983.

Another message, sent by the USS Guadalcanal's task group commander on February 16, 1983, advised the ships in a task group departing the area of a remote possibility that AA Garcia may have boarded a departing ship via helicopter. No departing ship reported finding the missing sailor on board.

On February 16, 1983, personnel aboard the USS Guadalcanal completed a report entitled "Absentee Wanted by the Armed Forces." The report advised civil law enforcement agencies that AA Garcia was wanted by the armed forces, and requested that any civil officer taking the absentee into custody contact the nearest military facility. Despite the report to civil authorities and the aforementioned notifications to military authorities, AA Garcia was never located.

A naval warrant officer began an informal investigation into AA Garcia's disappearance on February 15, 1983. On that day, the investigating officer obtained written statements from several servicemembers familiar with the missing airman apprentice. He also ascertained that AA Garcia had not been

marked absent on the morning muster report. The mustering officer had marked AA Garcia present that morning because some crewmembers thought they had seen him in the pay line just prior to muster. Upon further inquiry, the investigating officer determined that AA Garcia was not in the pay line that morning, because the missing sailor had not collected his accrued pay of $138.57. In the late afternoon on February 15, 1983, the ship's administrative officer inexplicably directed the investigating officer to terminate his investigation because AA Garcia had been classified as a deserter.

The investigating officer continued to collect information despite the administrative officer's direction. On February 18, 1983, he interviewed a close friend of AA Garcia. The friend related that AA Garcia had talked about joining a group of "freedom fighters" dedicated to the cause of freeing Cuba; that AA Garcia resented his father because the elder Garcia had not left Cuba to join the "freedom fighters"; and that AA Garcia had opined how easy it would be to board a helicopter and fly off the ship.

On or about February 20, 1983, the investigating officer retrieved AA Garcia's driver's license from the wallet found in the missing sailor's locker. He made enlarged copies of the picture on the license and distributed the photographs to civil and military authorities ashore in Beirut. No sightings of AA Garcia were reported despite the dissemination of the photographs.

During the first week of March 1983, the investigating officer was informed that, approximately two weeks prior, a Marine Corps officer returned to his stateroom aboard the USS Guadalcanal after operations ashore to find a utility uniform and a pack missing. The uniform and pack apparently were never found.

On September 7, 1983, the USS Guadalcanal received a letter from AA Garcia's mother, inquiring into the whereabouts of her son. The commanding officer of the ship responded by letter dated September 9, 1983. That letter related that AA Garcia had disappeared while the USS Guadalcanal was anchored two miles offshore; that he had expressed to several shipmates a desire to go ashore in Beirut; that it was probable that the sailor had stowed away aboard a helicopter or small boat bound for Beirut; that he had been declared a deserter as of February 15, 1983; and that if AA Garcia desired to return to the United States, he should report to the United States Embassy or the United States Marine Corps contingent in Beirut.

On September 21, 1983, the commander of the Naval Military Personnel Command ("NMPC") in Washington, D.C., advised the USS Guadalcanal by message that AA Garcia's grandmother had contacted a congressman seeking information regarding her grandson's disappearance. On September 23, 1983, the commanding officer of the USS Guadalcanal responded to the NMPC by message, providing essentially the same information that was included in the letter to AA Garcia's mother.

In a letter postmarked February 27, 1984, AA Garcia's grandmother appealed to the President of the United States for an explanation as to why she had not been notified of her grandson's disappearance. Answering on behalf of the President on July 16, 1984, an assistant secretary of the Navy explained that only primary next of kin are notified of a servicemember's absentee status and that the grandmother had not been listed by AA Garcia as his primary next of kin.

The Secretary of the Navy then directed the commanding officer of the USS Guadalcanal to respond to the grandmother's request for information regarding her grandson. In a letter dated July 31, 1984, the commanding officer provided the same information to the grandmother that was furnished to AA Garcia's mother. In addition, the letter stated that no new information regarding the missing sailor's whereabouts had been gained since the commanding officer had written to AA Garcia's mother.

On October 2, 1984, the commanding officer of the USS Guadalcanal initiated a formal investigation into the disappearance of AA Garcia. The same warrant officer who conducted the initial informal investigation of February 15, 1983, was appointed as the investigating officer for the formal inquiry. The investigating officer completed his re-

port on November 8, 1984. Based on his investigation, the warrant officer concluded that AA Garcia had donned a Marine Corps utility uniform and stowed away aboard a helicopter to Beirut. The investigating officer recommended that AA Garcia continue to be carried in a deserter status. The ship's commanding officer, as well as the commander of Amphibious Squadron Twelve, concurred with the investigating officer's findings of fact, opinions, and recommendations.

The commander of Amphibious Group Two also concurred with the facts, opinions, and recommendations in the report. In addition, he rebuked the commanding officer of the USS Guadalcanal for not convening a formal investigation upon discovery of AA Garcia's disappearance. He ordered the ship's commanding officer to request further investigative assistance from the Naval Investigative Service ("NIS").

On January 9, 1985, the USS Guadalcanal's commanding officer requested assistance from the NIS, specifically asking the agency to explore the possibility that foul play led to AA Garcia's disappearance. The NIS interviewed close friends of the missing sailor, as well as some family members, all of whom asserted that they had no contact with AA Garcia after February 15, 1983. The NIS exhausted all leads, yet found no relevant information at variance with the formal investigation conducted by the investigating officer aboard the USS Guadalcanal. The NIS closed its file on March 29, 1985. Based on the results of the NIS investigation, the commander of Amphibious Group Two recommended that AA Garcia continue to be carried in a deserter status.

On September 16, 1993, AA Garcia's father signed an affidavit declaring that he had not been in contact with his son since February 15, 1983. On January 6, 1994, AA Garcia's mother signed a similar affidavit. On May 13, 1994, a Florida state circuit court judge entered an order declaring AA Garcia to be deceased, based on the length of time that he had been missing. The Final Judgment Declaring Death of Missing Person declared AA Garcia deceased as of February 15, 1988. On September 28, 1994, AA Garcia's brother was appointed as the personal representative of the missing sailor's estate.

On or about December 16, 1994, the personal representative of AA Garcia's estate submitted an Application for Correction of Military Record to the BCNR. The application requested that AA Garcia's desertion and unauthorized absence status be revised to show that he died of unknown causes either on February 15, 1983, the date he was discovered missing, or on February 15, 1988, the date as of which the Florida state court declared him deceased. In support of the application, the personal representative provided a copy of the Florida state court judgment and the aforementioned affidavits of AA Garcia's parents.

On December 6, 1995, the BCNR considered the application for correction, along with the state court decree, the affidavits of AA Garcia's parents, and the record from which the aforementioned facts were drawn. The BCNR determined that the evidence submitted in support of the application was insufficient to establish the existence of probable material error or injustice in the record. The BCNR reported its decision in a letter to AA Garcia's brother dated January 19, 1996:

> The Board concludes that the evidence of record was sufficient to show that [AA Garcia] had an intention to desert on 15 February 1983 and that he should continue to be carried in a deserter status. The Board was aware that no death benefits can be paid if an individual dies in a deserter status. Given all the circumstances, the Board concluded that the record should not be changed. Accordingly, your application has been denied.

(Admin. R. at 6.) On January 6, 1997, the personal representative of AA Garcia's estate, along with AA Garcia's parents, filed their Complaint in this Court.

The plaintiffs' Complaint alleges that the Navy acted in an arbitrary and capricious manner and contrary to law and the facts by determining that AA Garcia deserted as of February 15, 1983, and by failing to conduct a timely formal investigation into AA Garcia's disappearance. The Complaint also alleges that the BCNR acted arbitrarily and capriciously in refusing to change AA Gar-

cia's deserter status despite the introduction of the state court declaration of death. The Complaint further alleges that the BCNR's decision was defective as a matter of law because the BCNR did not give full faith and credit to the state court decree. The plaintiffs pray for a change in AA Garcia's military records to reflect death rather than desertion, an order from this Court recognizing the death of AA Garcia on February 15, 1988, payment of the accrued pay and allowances due AA Garcia as of the date of his presumed death, payment of a death gratuity, and such other relief as this Court may deem just.

In response to the Complaint, the defendant filed its current Motion for Judgment upon the Record, asserting that the Navy's decision to declare AA Garcia a deserter and the BCNR's decision refusing to change the classification were not arbitrary, capricious, unsupported by substantial evidence, or contrary to law. The defendant moves for judgment upon the record on the grounds that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law.

The plaintiffs subsequently filed their instant Cross–Motion for Judgment on the Record. The plaintiffs agree that there is no genuine issue as to any material fact and assert that they are entitled to judgment upon the record because the BCNR's decision was arbitrary, capricious, unsupported by substantial evidence, and contrary to law.

### Discussion

■ Judgment upon the administrative record is properly granted when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). In the present posture of this case, where both parties have moved for judgment on the record, each party's motion must be evaluated on its own merits, drawing all reasonable inferences against the party whose motion is being considered. *See Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). The plaintiffs and the defendant in this case agree that there is no genuine issue as to any material

fact. The Court's task, therefore, is to determine whether either party is entitled to judgment as a matter of law.

■ The parties concur that this Court's review of military personnel decisions is narrow. Judicial review of military administrative decisions with monetary consequences "is limited to determining whether the * * * action was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which [the complainant] has been seriously prejudiced." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed.Cir.1983) (quoting *Clayton v. United States*, 225 Ct.Cl. 593, 595 (1980)); *see also Sanders v. United States*, 219 Ct.Cl. 285, 298, 594 F.2d 804, 811 (1979) (asserting that "[o]nce a plaintiff has sought relief from the Correction Board, such plaintiff is bound by that board's determination unless he can meet the difficult standard of proof that the Correction Board's decision was illegal because it was arbitrary, or capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law * * * and money is due." (Citations omitted)). The plaintiffs bear the burden of establishing such an infirmity in the challenged military decision with " 'cogent and clearly convincing evidence.' " *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed.Cir.1986) (quoting *Dorl v. United States*, 200 Ct.Cl. 626, 633 (1973)). In challenging a military personnel action, the plaintiffs also must "overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Doe v. United States*, 132 F.3d 1430, 1434 (Fed.Cir.1997) (citing *Sanders*, 219 Ct.Cl. at 302, 594 F.2d 804).

The applicable standard of review does not allow this Court to reweigh the evidence that was considered by the BCNR in reaching its decision, but rather to determine whether or not the BCNR's conclusion was supported by substantial evidence. *See Heisig*, 719 F.2d at 1157; *Robbins v. United States*, 29 Fed. Cl. 717, 725 (1993). The standard of review ultimately is a narrow one, and "[t]he court is not empowered to substitute its judgment for

that of the [BCNR]." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

■ The gravamen of the plaintiffs' Complaint is that the BCNR's refusal to expunge the deserter classification from AA Garcia's military record constituted legal error. It is only through removal of the status at issue that the plaintiffs may gain entitlement to the monetary relief that they seek. The monetary relief sought is payment of the death gratuity authorized by 10 U.S.C. §§ 1475–80 and payment of the accrued pay and allowances due AA Garcia as of the date of his presumed death. No death gratuity may be paid, however, if a servicemember dies while in a deserter status. *See* Department of Defense Financial Management Regulation ("FMR") ¶ 40505c(2) (Dec.1994). Accordingly, unless AA Garcia's classification as a deserter as of February 15, 1983, is expunged, his presumed death in 1988 would have occurred while in a deserter status, making the plaintiffs ineligible for the death gratuity. Furthermore, neither a servicemember nor his beneficiary is entitled to pay and allowances for a period during which the servicemember is absent from his unit without authority. *See* FMR, Vol. 7A, Table 4–3–2, Rule 5. Consequently, unless AA Garcia's deserter classification is expunged, the plaintiffs are not entitled to any pay or allowances that otherwise may have accrued after AA Garcia disappeared on February 15, 1983.[2]

The plaintiffs acknowledge that they bear the burden of showing the requisite infirmity of the decision by the BCNR that retained AA Garcia's deserter status. They contend, on two grounds, that they have met that burden and that they thus are entitled to judgment as a matter of law. First, the plaintiffs argue that the decision of the BCNR was contrary to law because the

BCNR did not accord the appropriate weight to the state court declaration of AA Garcia's death. Second, the plaintiffs assert that the BCNR decision was not supported by substantial evidence. The Court will examine each of these contentions in turn.

The plaintiffs cite one case, *Midgett v. United States*, 221 Ct.Cl. 171, 603 F.2d 835 (1979), in support of their proposition that the underlying BCNR decision was arbitrary, capricious, unsupported by substantial evidence, and contrary to law. Essentially, the plaintiffs assert that the instant case is indistinguishable from *Midgett* and that because the court in *Midgett* found for the plaintiffs, the Court in this case should do the same. The Court, however, disagrees.

In light of the plaintiffs' complete reliance on *Midgett*, the Court finds it beneficial to provide herein an overview of that case. *Midgett* concerned an Army private who disappeared on November 25, 1967, while serving in Vietnam. Private Midgett had been given a liberty pass for that day with instructions to return to his unit by 5:00 p.m. The soldier failed to return at the expiration of his liberty. Solely by operation of military regulations, Private Midgett mandatorily was declared a deserter after 29 consecutive days of absence from his unit. The record contained no evidence of an intent to desert on the part of Private Midgett, except for one uncorroborated statement by an acquaintance of Private Midgett that the missing soldier "had the feeling he wanted to bug out for awhile." *Midgett*, 221 Ct.Cl. at 176, 603 F.2d 835.

On August 11, 1975, Private Midgett's parents obtained a state court decree declaring that Private Midgett was presumed dead as of November 25, 1967, the same date as of which the Army had administratively classified the soldier as a deserter. On August 21,

---

**2.** The plaintiffs also request an order from this Court declaring that AA Garcia died on February 15, 1988. It appears to this Court that, unless the plaintiffs are entitled to removal of the deserter classification and the accompanying monetary relief, it would be imprudent to issue such an order. This Court has jurisdiction over money claims against the United States. 28 U.S.C. § 1491(a); *see United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114

(1976); *Sanders*, 219 Ct.Cl. at 295, 594 F.2d 804. An order recognizing a date of death of February 15, 1988, would not by itself entitle the plaintiffs to any monetary relief in this Court. Unless AA Garcia's deserter status is expunged, then, an order merely declaring the date of his death would constitute a declaratory judgment, which is outside the jurisdictional scope conferred upon this Court by 28 U.S.C. § 1491.

1975, Private Midgett's parents applied to the Army Board for Correction of Military Records ("ABCMR") to change the military record of their son to show that he had died, rather than deserted, on November 25, 1967. In support of their application, the parents provided the state court decree of death, as well as letters written by their son prior to his disappearance that revealed a lack of intent to desert the Army. The ABCMR denied the application, and Private Midgett's parents filed suit in the United States Court of Claims ("Court of Claims," predecessor of the United States Court of Federal Claims), contending that the ABCMR decision was arbitrary, contrary to law, not based on substantial evidence, and an abuse of administrative discretion in that it ignored the decree of death from the state court.

The Court of Claims noted that the regulation under which Private Midgett was classified as a deserter did not require an intent to desert; rather, the classification was merely an administrative convenience which required a unit to drop a person from its rolls after 29 consecutive days of unexplained absence. The court reviewed the evidence that was before the ABCMR in considering the Midgetts' application, and found "that the initial determination, 'absent without leave,' was based on nothing more than administrative convenience and a hearsay statement, uncorroborated and of questionable probative value, that Midgett had said he 'had the feeling he wanted to bug out for awhile.'" *Midgett*, 221 Ct.Cl. at 184, 603 F.2d 835. The court also examined the statement allegedly made by the missing soldier and asserted that "the very language in itself describes a limited, and not a permanent departure, *i.e.,* 'for awhile.'" *Id.*

The court also reviewed the letters that were before the ABCMR. The letters, writ-

ten by Private Midgett to his parents, "contain[ed] affirmative evidence of lack of any intent on the part of Midgett to desert." *Id.* at 185, 603 F.2d 835. In evaluating the letters, the court determined:

> This correspondence, in the record before the ABCMR, was evidence not available to Midgett's unit commander. It is not only substantial, but would support a finding by the board that an error or an injustice had been committed in listing Private Midgett as a deserter, or in finding that he had any intent to desert. It in no way supports an opposite inference, and, there being no direct evidence of desertion *vel non,* inferences are all that are available to reach a conclusion on the question of desertion.

*Id.* at 186, 603 F.2d 835. Continuing its review, the court ascertained that "the record before the [ABCMR] is shown to have contained *no* evidence to support the findings of the unit commander, or its affirmance by the [ABCMR], that Private Midgett was a deserter." *Id.* at 187, 603 F.2d 835. To the contrary, "[t]he evidence is all the other way." *Id.*, at 188, 603 F.2d 835. The court cited the state decree of death, the letters, and the circumstances surrounding Private Midgett's disappearance (*i.e.,* he disappeared in a region that was in a state of wartime hostilities) as evidence that the soldier was not a deserter.

Turning to the effect of the state decree of death, the court stated that the plaintiffs could use the decree to establish a legal presumption of death, assuming that the decree was entitled to full faith and credit by the ABCMR.[3] "[I]f the decree is granted full faith and credit, the determination of death would be a legal presumption which the Army would have to rebut, and the decree would be treated as prima facie evidence

---

**3.** "Section 1738 of 28 U.S.C. imposes on a federal court [or an administrative body of the United States] presented with a state court judgment the same force and conclusive effect as it has in the state in which it is rendered." *Midgett,* 221 Ct.Cl. at 189, 603 F.2d 835. The state decree could be ignored by the federal agency or court, however, if giving full faith and credit to the decree would significantly encroach on an important federal policy. *See id.* (citing *Byrd v. Blue Ridge Coop.,* 356 U.S. 525, 78 S.Ct. 893, 2

L.Ed.2d 953 (1958)). It is not necessary for this Court to determine whether or not any federal policies would be compromised by granting the state court decree full faith and credit. The defendant has not identified any policies that would deter the operation of 28 U.S.C. § 1738; therefore, for the purpose of ruling on the defendant's motion for judgment on the record, this Court assumes that the BCNR was required to afford the state court decree full faith and credit.

of the findings therein, including the date of death." *Id.* at 190, 603 F.2d 835. The court held that the Army's "administrative presumption of desertion based on 29 consecutive days of absence without leave is not evidence satisfactory to rebut the plaintiffs' case." *Id.* at 191, 603 F.2d 835. In denying the defendant's motion for summary judgment and granting the plaintiffs' cross-motion for summary judgment, the court held:

> that the ABCMR's reliance on the administrative presumption of desertion, and the uncorroborated, inconclusive, and secondhand testimony of former comrades of Midgett is legal error, as the board had before it a legal presumption of death at a particular time in the form of a decree of death from a civil court, as well as the fact of Midgett's disappearance at a time and place of wartime hostilities. And even if we do not fight the "battle of presumptions" and determine that the legal presumption of death has precedence over the administrative presumption of continued life, we find the decision of the ABCMR to be arbitrary and capricious. Its decision to affirm the conclusion of Midgett's unit commander was not supported by substantial evidence; indeed, the evidence before the board was sufficient to warrant the changes requested by the Midgetts.

*Id.* at 195, 603 F.2d 835.

Relying on *Midgett,* the plaintiffs in the instant case assert that the Florida court decree created a presumption of the death of AA Garcia that the Navy failed to rebut at the BCNR hearing. The plaintiffs propound that the BCNR decision to deny their application was contrary to the law enunciated in *Midgett* because the board refused to give appropriate weight to the state court decree and because the Navy presented no evidence to rebut the presumption to which the plaintiffs believe they are entitled.

■ This Court is constrained to find, however, that the BCNR's refusal to change AA Garcia's deserter status based on the state court decree of death was not contrary to law. The plaintiffs are required to present "cogent and clearly convincing evidence" that the decision of the BCNR was contrary to law. *Wronke,* 787 F.2d at 1576. The decree of the Florida court does not meet that standard. On its face, the decree declares February 15, 1988, as the date of death of AA Garcia. Assuming that the state court judgment is entitled to full faith and credit, "the decree would be treated as prima facie evidence of the findings therein, *including the date of death.*" *Midgett,* 221 Ct.Cl. at 190, 603 F.2d 835 (emphasis added). At best, the Florida decree is prima facie evidence that AA Garcia died and that the date of his death is February 15, 1988. The Navy, however, determined that AA Garcia deserted on February 15, 1983. The legal presumption created by the state court decree does not overcome this determination. Construing the decree in the light most favorable to the plaintiffs, the best that may be said is that AA Garcia died five years after he was declared a deserter. Consequently, the BCNR did not act contrary to law in refusing to change the determination that AA Garcia deserted the Navy on February 15, 1983, despite the introduction of the state decree.

■ Again relying on *Midgett,* the plaintiffs next argue that the BCNR was required to grant their application for correction of AA Garcia's military record because the Navy's determination that the missing sailor is a deserter was not supported by substantial evidence.[4] This argument also is unavailing.

In *Midgett,* the missing soldier was administratively classified as a deserter merely because he had been absent from his unit for 29 consecutive days. The classification oc-

---

4. The plaintiffs' motion asserts that the classification of AA Garcia as a deserter in the first instance was not supported by substantial evidence. Technically, the Court does not review the commanding officer's decision, but rather the decision of the BCNR affirming the commanding officer's decision. The duty of this Court is to "examine the basis of the [BCNR]'s decision and decide * * * whether it was supported by sub- stantial evidence." *Midgett,* 221 Ct.Cl. at 180, 603 F.2d 835. "In doing so, [the Court] must carefully review the evidence before the [BCNR]." *Id.* This review, of course, warrants a consideration of the evidence available to the commanding officer when he made the deserter determination, as such evidence largely served as the basis of the BCNR's decision to deny the plaintiffs' application for correction.

curred automatically by operation of a military regulation; no intent to desert was required in order for the deserter classification to attach after 29 consecutive days of unexplained absence. In fact, the only evidence that Private Midgett had an intent to desert was an uncorroborated statement by a witness that the missing soldier had expressed a desire to "bug out for awhile." *Midgett,* 221 Ct.Cl. at 176, 603 F.2d 835. In determining that the ABCMR had erred in refusing to change the deserter classification, the Court of Claims noted that the ABCMR should have considered the state decree of death as, at the very least, *"a relevant fact* bearing upon the * * * *date* Private Midgett could be declared dead for the purposes of Army administration." *Id.* at 191, 603 F.2d 835. The state court decree, assuming it was entitled to full faith and credit, established a legal presumption that Private Midgett had died on November 25, 1967, the same date as of which the Army had declared him a deserter. The only thing before the ABCMR that supported a determination of desertion was the uncorroborated statement of a witness. Not only was the statement uncorroborated, but the hearsay statement of Private Midgett reported by the witness in itself described only a limited, rather than permanent, departure from military control, *i.e.,* "he wanted to bug out *for awhile." Id.* at 176, 603 F.2d 835 (emphasis added). This scant evidence was insufficient to rebut the legal presumption of death established by the state court decree. In summary, the plaintiffs in *Midgett* presented cogent and clearly convincing evidence to the ABCMR, in the form of a state court decree and letters written by the missing soldier, that Private Midgett had died, not deserted, on November 25, 1967. The record did not contain substantial evidence to support the Army's classification of the soldier as a deserter, so the Army could not rebut the legal presumption of death established by the court decree. The ABCMR thus erred in refusing to remove the deserter classification from Private Midgett's records.

The circumstances surrounding AA Garcia's classification as a deserter are entirely different from those present in *Midgett.* Private Midgett was required to be classified as a deserter solely because he had been absent from his unit for 29 consecutive days. AA Garcia was declared a deserter under a different regulation, published in the Naval Military Personnel Manual ("Pers.Man."), which provides:

2. An absentee shall be declared a deserter when:

a. The facts and circumstances of absence without regard to the length of absence indicate that the member may have committed the offense of desertion, * * * or

* * * *

c. The member is absent without authority without regard to length of absence and has gone to, or has shown intention of going to, any foreign country * * *.

Pers. Man. ¶ 3430100 (Apr.1982). AA Garcia was designated as a deserter on February 15, 1983, because the facts and circumstances surrounding his disappearance indicated that the missing sailor may have committed the offense of desertion [5] and because AA Garcia had expressed an intention of going to a foreign country.

The plaintiffs contend that the information available to the commanding officer at the time he declared AA Garcia to be a deserter did not constitute "substantial evidence" that would support the decision and that the record before the BCNR did not contain "substantial evidence" to sustain the commanding officer's decision. "Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Jennings v. Merit Sys. Protection Bd.,* 59 F.3d 159, 160 (Fed.Cir.1995).

The plaintiffs do not dispute that, contemporaneous with AA Garcia's disappearance, no fewer than five shipmates related that they had heard AA Garcia state on February 14, 1983, that he was going ashore. Nor do they dispute that extensive helicopter flight operations from ship to shore were underway

---

**5.** The Uniform Code of Military Justice provides, in pertinent part, that "[a]ny member of the armed forces who * * * without authority goes or remains absent from his unit, organization, or place of duty with intent to remain away therefrom permanently * * * is guilty of desertion." 10 U.S.C. § 885(a) (1994).

at the time that AA Garcia disappeared. They do not dispute that a working uniform with the name "Garcia" stenciled on it was found near an aircraft elevator on the day that AA Garcia disappeared. They do not dispute that a Marine Corps officer reported that one of his utility uniforms was missing.

Rather than dispute the above facts, the plaintiffs attack the weight of the evidence. They contend that AA Garcia was joking when he made statements about going ashore to Lebanon. They feel that the statements should be given no more weight than was given to the uncorroborated statement of the witness in *Midgett*. They argue that the uniform found near an aircraft elevator with the name "Garcia" stenciled on it might have belonged to some other sailor with the surname of Garcia. They argue that, because the USS Guadalcanal's task group commander stated that there was a remote possibility that AA Garcia cross-decked to a departing *ship* by helicopter, there also must have been only a remote chance that Garcia boarded a helicopter to fly *ashore*. They argue that AA Garcia might not have donned the missing Marine Corps uniform because the uniform might not have been AA Garcia's size. Finally, they argue that the delay in initiating a formal investigation might have precluded discovery of evidence that AA Garcia was not a deserter, but rather a sailor lost at sea. The plaintiffs surmise that all of the evidence relied upon by the commanding officer, and subsequently by the BCNR, was subject to at least two interpretations and that such ambiguity should be resolved in favor of the plaintiffs.

This Court will not undertake a reweighing of the evidence that was considered by the commanding officer and thereafter by the BCNR. Indeed, the applicable standard of review does not permit this Court to reweigh the evidence, but rather to determine whether or not there existed "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Jennings*, 59 F.3d at 160. Moreover, even if the evidence is subject to at least two interpretations, this Court is proscribed from substituting its judgment for that of the BCNR when reasonable minds could reach different conclusions. *See Maier v. Orr*, 754 F.2d 973, 984 (Fed.Cir.1985); *Sanders*, 219 Ct.Cl. at 302, 594 F.2d 804.

The relevant evidence surrounding AA Garcia's disappearance is such that a reasonable mind could reach the conclusion that AA Garcia had deserted his military unit. Unlike the uncorroborated statement in *Midgett*, no fewer than five shipmates executed written statements on the date of AA Garcia's disappearance corroborating AA Garcia's statement that he was going ashore. Also unlike *Midgett*, AA Garcia's purported statements did not express a limited departure from the control of the United States military. In contrast to the statement allegedly made by the missing soldier in *Midgett*, AA Garcia's purported statements regarding going ashore were not modified by the clause "for awhile." At least two shipmates described AA Garcia's desire to leave the ship and join an organization that would send him to Cuba. He had described to associates the means by which he could escape the ship by donning a Marine Corps uniform and stowing away aboard a helicopter. He had access to laundered Marine Corps uniforms the night prior to his disappearance. A working uniform with the name "Garcia" stenciled on it was found near an aircraft elevator on the day that AA Garcia was discovered missing. An inventory of AA Garcia's locker revealed that the sailor's civilian clothes were missing and that his military identification card was left in the locker. At the very least, the aggregate of these circumstances represents "substantial evidence," *i.e.,* evidence that a reasonable mind might accept as adequate to support the conclusion that AA Garcia deserted his ship on February 15, 1983.

The plaintiffs raise arguments that offer different interpretations of the individual pieces of evidence available to the commanding officer when he made his decision. Mere arguments of interpretation, however, do not amount to cogent and clearly convincing evidence that the commanding officer's decision was not based on substantial evidence. The Court's narrow standard of review does not permit it to adopt the plaintiff's interpretation of the evidence if reasonable minds could adopt the interpretation that was adopted by

the commanding officer and subsequently by the BCNR. The plaintiffs have not made a showing to overcome the "strong, but rebuttable, presumption" that the commanding officer and the members of the BCNR, in declaring AA Garcia to be a deserter, "discharge[d] their duties correctly, lawfully, and in good faith." *Sanders*, 219 Ct.Cl. at 302, 594 F.2d 804. The Court finds that substantial evidence exists in the record to support the BCNR's decision to affirm the commanding officer's classification of AA Garcia as a deserter as of February 15, 1983.

The Court finds it immaterial that the substantial evidence relied upon by the commanding officer was procured by means of an informal investigation. The plaintiffs have not alleged that any statute or regulation requires a commanding officer to initiate a formal investigation prior to declaring a missing sailor to be a deserter. Consequently, this court finds the delay in the initiation of a formal investigation into AA Garcia's disappearance to be an insufficient ground upon which to void the BCNR's affirmance of the commanding officer's decision.

Given that the classification of AA Garcia as a deserter was supported by substantial evidence when the commanding officer made his decision in 1983, the plaintiffs further contend that the record did not contain substantial evidence to overcome the new evidence presented to the BCNR. The new evidence consisted of the state court decree of death and affidavits by AA Garcia's parents. In addition to failing for many of the reasons previously addressed, the plaintiffs' argument places the burden of proof on the wrong party. The plaintiffs are burdened with establishing the infirmity of the challenged BCNR determination with "cogent and clearly convincing evidence." *Wronke*, 787 F.2d at 1576. The determination at issue is the BCNR's decision to retain the classification of AA Garcia as a deserter as of February 15, 1983. The state court decree and affidavits of AA Garcia's parents do not amount to cogent and clearly convincing evidence that the BCNR decision was infirm.

First, the decree establishes a legal presumption that the date of AA Garcia's death is February 15, *1988*. As previously explained, even assuming that the decree is entitled to full faith and credit by the BCNR and this Court, the document does not bear any relevance to the question of whether or not AA Garcia deserted his unit in *1983*. Second, the affidavits reciting that AA Garcia's parents have not had contact with him since February 15, 1983, also do not constitute cogent and clearly convincing evidence that the BCNR's decision upholding the deserter classification was infirm. AA Garcia's enlistment papers declare that AA Garcia did not know the addresses of his parents and that he had not kept in contact with them "at all" for the eleven years immediately preceding his enlistment. Given the long absence of contact with his parents prior to entering the Navy, it is not surprising that AA Garcia did not contact his parents at any point after February 15, 1983. Under the facts of this particular case, this Court declines to hold as a matter of law that lack of parental contact is cogent and clearly convincing evidence that the classification of AA Garcia as a deserter constitutes material error or an injustice.

The Court holds that there is substantial evidence in the record to support the BCNR's decision to deny the plaintiffs' application for the correction of AA Garcia's military record. The Court further holds that the BCNR's decision to uphold AA Garcia's deserter classification despite the introduction of the state court decree of death and the affidavits of AA Garcia's parents was not arbitrary, capricious, unsupported by substantial evidence, or contrary to law. Because the plaintiffs have failed to show that they are entitled to judgment on the record, their cross-motion is denied. As there are no disputed issues of material fact and the defendant has shown that the plaintiffs are unable to establish the requisite infirmity of the decision of the BCNR, the defendant is entitled to judgment as a matter of law. Therefore, the defendant's motion for judgment on the record is granted.[6]

6. The primary issue presented before this Court for determination was whether or not the BCNR's decision to retain the deserter status of AA Garcia was arbitrary, capricious, unsupported by substantial evidence, or contrary to law. As set out in this Opinion, the defendant is enti-

CONCLUSION

For the foregoing reasons, the Defendant's Motion for Judgment upon the Record is granted, the Plaintiffs' Cross–Motion for Judgment on the Record is denied, and the plaintiff's Complaint is to be dismissed.

No costs.

tled to judgment as a matter of law on this issue. The Court notes, however, that the record reveals that AA Garcia was due accrued pay of $138.57 at the time of his disappearance on February 15, 1983. The defendant admits in its Motion for Judgment Upon the Record that, based upon the defendant's own records, AA Garcia was due $138.57 at the time he was classified as a deserter. Because that sum accrued prior to AA Garcia's disappearance, entitlement to that sum exists notwithstanding AA Garcia's deserter status and thus constitutes a separate claim that is not affected by the Court's grant of summary judgment in this case. As noted in the defendant's brief, the estate of AA Garcia may collect the $138.57 that the Government admits is due by filing an administrative claim with the Defense Finance and Accounting Service. Although hopefully unnecessary in light of the Government's admission, the plaintiffs may seek judicial review if their $138.57 claim is not resolved through administrative channels.