Carla L. THOMAS, Plaintiff,

v.

UNITED STATES, Defendant.

No. 98–770C.

United States Court of Federal Claims.

July 31, 2000.

John C. Kiyonaga, Kiyonaga & Kiyonaga, Alexandria, Virginia, attorney of record for the plaintiff. David J. Kiyonaga, of counsel.

Russell A. Shultis, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were David M. Cohen, Director, and James M. Kinsella, Assistant Director, Commercial Litigation Branch, attorneys of record for the defendant. Lieutenant Colonel Terry Elling and Captain Arden B. Levy, Office of The Judge Advocate General, Department of the Army, Arlington, VA, of counsel.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The plaintiff, Carla L. Thomas, was commissioned in the United States Army on April 27, 1991, and separated from the Army on November 5, 1993 with a General Discharge (Under Honorable Conditions).[1] Ms. Thomas filed a complaint with this court which requests the defendant to expunge selected Officer Evaluation Reports (OERs) and a Letter of Reprimand from her military record, to reinstate her as an officer in the Army, and to award her back pay.

Ms. Thomas states that she graduated as an Army Reserve Officers' Training Corps (ROTC) Distinguished Military Graduate from Florida A & M University, with a B.A. degree, cum laude, in Criminal Justice. After completing the Army's Officer Basic Course, Lieutenant Thomas was assigned to a military police security unit at the Sierra

Army Depot (SIAD), Herlong, California in November 1991. She received a positive review of her performance for her first six months at Sierra in an Officer Evaluation Report (OER), which stated, among other comments: "Initial indications are that Lieutenant Thomas is going to be one of the best officers I senior rate .... She is dedicated, conscientious and clearly has unlimited ability." The senior rater, Major Paul Gullett, recommended that she be promoted and selected as the executive officer.

Some three months later, however, beginning on June 22, 1992, and again on August 17, 1992, Lieutenant Thomas began receiving Letters of Concern from her military supervisor for infractions. On September 22, 1992, she received a third Letter of Counseling from her supervisor, Captain Stacy Grams, who concluded that Lieutenant Thomas had shown a lack of maturity and insubordination. As a result, Lieutenant Thomas was removed by Captain Grams from her platoon leader duties. In addition, three soldiers filed complaints against Lieutenant Thomas. Captain Jerry Paschke of the Office of Judge Advocate General (JAG) was assigned to investigate the complaints, and issued his report on October 22, 1992. During the course of his investigation, Captain Paschke interviewed fifty people, including members of the plaintiff's platoon. Captain Paschke's investigation made adverse findings against Lieutenant Thomas.

Lieutenant Thomas received a Relief for Cause Officer Evaluation Report covering her performance from March 27, 1992 through October 19, 1992, the same time frame addressed in Captain Paschke's investigation. The evaluation report stated:

> The qualities and attributes inherent of a commissioned officer are lacking in 2LT Thomas' performance. She displayed a lack of professionalism, sound judgment and integrity. She willfully disobeyed a direct order not to go to Fort Ord without a pass. She went anyway and instructed

---

1. The facts are based on the Administrative Record, which, unfortunately, was filed without an index in violation of RCFC 83.1, and the Defendant's Statement of Facts submitted on March 5, 1999, to which the plaintiff stated, "she had no disagreement." Plaintiff did file one "Additional Fact" to supplement paragraph 2 of Defendant's Statement of Facts, which the defendant did not dispute.

one of her soldiers to lie about the trip. She violated an area SOP [Standard Operating Procedure] countless times by sleeping on duty. She failed to support the chain of command by constantly complaining about schedule changes and policies. She required every soldier to pay money in order to replace stolen funds collected for a departing NCO's [noncommissioned officer's] gift. She made derogatory comments about soldiers and their families. She habitually referred to soldiers and their spouses by unwelcome and often obscene nicknames. A common topic of discussion on duty was her sex life and that of soldiers as well as the commander's. She knowingly allowed the viewing of pornographic movies in the only break area available to soldiers while on duty in the secure area. She tolerated the illegal carrying of a concealed loaded handgun by one of her soldiers during an overnight unit trip to an amusement park. She knew of the violation and potential hazards yet failed to take any action. Her personal misconduct and poor judgment have resulted in a detrimental effect on the morale and good order of the unit. 2LT Thomas is a burden to this organization. I have relieved her and informed her of the reasons for her relief.

This OER also indicated that "2a. [Lieutenant Thomas] [c]onveniently misunderstands or misinterprets orders and regulations. 4a. Insulting and verbally abusive to others. 5b. Blames others for shortcomings. 8a. Constantly made inappropriate decisions when higher authority was not present. 10a. Inappropriate concerns for her personal interests diminish her adaptability. 11a. Conduct has set an extremely negative role model for subordinates. 12a. Not in compliance with AR 600–9 [the Army's weight regulations]."

On December 22, 1992, Major General Dennis Benchoff, the Commanding General of the Army Depot System Command, issued a memorandum initiating Lieutenant Thomas' elimination from the military under Army Regulation 635–100, based on substandard performance of duty and misconduct. The Initiation of Elimination memorandum listed fourteen different incidents as reasons for discharging her from the Army. The fourteen reasons were as follows:

(1) You borrowed $300.00 from a junior enlisted soldier for personal reasons. (2) You knowingly allowed a soldier in your platoon to carry a concealed loaded handgun, which she had no permit to carry, on an overnight unit trip to an amusement park. (3) You tolerated the repeated showing of pornographic movies to soldiers on duty in a Special Weapons area. Even after you became aware of this practice, you took no affirmative action to ensure it would not happen again. (4) You made a trip to Ft. Ord without a pass after being told by your commander that you needed a pass for this trip. While on this trip, you instructed a junior enlisted soldier who accompanied you to lie for you if she was asked about the trip. (5) You required your soldiers to pay 50 cents at the end of a shift to replace money that was discovered missing earlier in the day. This missing money was intended for a gift for a departing NCO. The majority of the soldiers describing the incident believed the collection was coercive. (6) You repeatedly harassed soldiers including NCO's, by calling them derogatory names and embarrassing them in front of the rest of the platoon. This harassment also included making comments about some of the soldiers' wives, and asking soldiers about their sex lives in front of others. You repeatedly discussed your sex life in front of groups of soldiers and used vulgar language in these discussions. (7) You repeatedly made derogatory and untrue statements about officers and NCOs, including your commander and your unit's First Sergeant. (8) You incited your soldiers to complain to your commander, write to Congress, and complain to the IG [Inspector General] about changes in the duty schedule. You also incited soldiers to complain about their retention in the Special Weapons area during a lost weapon investigation to their Congressional representatives, the media, and others who might influence the situation. On both of these occasions, you failed to support the decisions of your chain of command and

complained fiercely about both decisions in front of your soldiers. (9) You failed to reimburse to the soldiers the money you collected for the purpose of renting transient quarters at the Presidio of San Francisco for a platoon trip to an amusement park that was not spent for that purpose. (10) You failed to reimburse to the soldiers the money you collected for a platoon picnic that was not spent for that purpose. (11) You also required that your soldiers attend a dinner for a departing NCO, under circumstances that most of them regarded as coercive.... [12] You were not present in the Special Weapons area for an announced inspection of your platoon and were not excused from this inspection. Your platoon failed the inspection, in part, because of your absence. [13] Your gross disregard for proper security practices is reflected in such acts as: requiring approximately half of your 15 soldier response force engage in corrective training simultaneously, and, on another occasion, sounding the alert alarm to gain access to a video game. [14] You repeatedly and intentionally slept on duty during night shifts in a Special Weapons area in violation of unit SOP [Standard Operating Procedure], and disregarded the procedures specifically described to you by your commander at your request.

The first eleven reasons were categorized as failure to exercise the necessary leadership required of a commissioned officer. The final three reasons were categorized as intentional neglect of performance of duties. General Benchoff recommended that the plaintiff be discharged from the Army with a General Discharge (Under Honorable Conditions). The memorandum also informed plaintiff of her right to obtain assistance of counsel and to submit a written response to the memorandum and discharge proceedings.

Lieutenant Thomas responded to the 14 allegations in a memorandum dated February 18, 1993, denying each allegation, and asking that the discharge action against her be dismissed. Her responses follow:

■ I never borrowed $300.00 from a junior enlisted soldier for personal reasons.... [T]he soldier['s] statement refutes this allegation. [2] I never knowingly allowed a soldier in my platoon to carry a concealed loaded handgun, which [the soldier] had no permit to carry, on an overnight unit trip to an amusement park.... The soldier's weapon was not signed out of the arms room and the soldier's statement confirms this fact .... [3] I did not tolerate the showing of pornographic movies on duty in the Special Weapons Area.... Once I did become aware of this activity I immediately ordered them to stop the unacceptable behavior. I cautioned the NCO's and warned them that Colonel Germain had fired personnel for viewing such material in the work place .... [4] CPT Grams states that I was given a direct order not to go to Ft. Ord without a pass. This is simply not true. I was directed not to exceed the 300 mile radius because in accordance with the Company policy a pass would then be required, ... Ft. Ord is measured at approximately 283 miles .... I also never asked a soldier to violate her integrity regarding the trip .... [5] Never have I ordered or coerced soldiers to pay money for a departing NCO's gift .... [6] I never harassed any soldiers or their wives by calling them derogatory names... nor have I discussed my sex life in front of groups of soldiers ... I have cautioned soldiers on prohibited sexual behaviors .... [7] I have not made derogatory or untrue statements about other officers, NCO's, including the Commander and unit First Sergeant .... [8] During my tour as Platoon Leader, I whole heartedly [sic] supported my chain of command. I never encouraged soldiers to write Congress, or complain to the IG about changes in the duty schedule. Also, I never incited soldiers to complain to their Congressional representatives, the media, and others who might influence the situation about their retention in the Special Weapons Area during a lost weapon investigation .... [9] Some soldiers were reimbursed money for payment of transient quarters at Presidio of San Francisco. Others said not to worry about reimbursing them because I was paying for all the gas for the

two vans which we had used for the trip. I used the money to pay for gas for the vans .... [10] All the money collected for the platoon picnic was given to SSG Thomas Carr. He and his wife bought what was needed for the picnic .... [11] Never under any circumstances have I required soldiers to attend a dinner for a departing NCO .... [12] Third Platoon did not fail the inspection because of my absence. On 6 August 1992, I was not present in the Special Weapons Area for Third Platoon's announced inspection because 0630 every Thursday staff call was scheduled ... I had discussed this with CPT Grams and she approved my absence.... Later, while in the area a soldier left which caused the platoon to be short one person and fail the inspection .... [13] It was a common act, that soldiers conducted corrective training in the Special Weapons Area .... Also, I never sounded the alert alarm to gain access to a video game .... [14] Sleeping in the Special Weapons Area is a common act as shown by [Thomas' documents]. I did sleep while on duty with the prior approval of CPT Grams.

Colonel Allen Germain, the depot commander, responded point by point to Lieutenant Thomas' rebuttal on March 4, 1993. He rejected her defenses, stating, "[e]very incident described in the Initiation of Elimination is supported by specific facts, gathered in the course of investigations by the unit, CPT Paschke of SIAD's Legal Office, and myself."

Several different investigations reviewed the matters related to Lieutenant Thomas' military tenure at the Sierra Army Depot. On January 19, 1993, the Army Materiel Command Inspector General (AMC–IG) opened an investigation into the possible violation of Lieutenant Thomas' due process rights. The investigation appears to have been concluded on or about February 26, 1993. A chronology of events indicates that on February 22, 1993, "On site inquiry at sierra [sic] conducted.... Conclusion: Soldiers were ordered not to talk to 2LT Thomas by MP Co. XO [Military Police Executive Officer] in Sep 92 and still believed this to be

in effect. [Individuals] were informed and said they would tell soldiers that the [order] was recended [sic] and that any soldier could talk with 2LT Thomas for the purpose of her gathering statements in support of her defense." The report suggested that certain statements taken from particular soldiers "should be discarded as they may have been taken under coercion and that he [the investigator] should inquire into the reported ongoing method of getting additional staements [sic]."

After investigating the Sierra Army Depot both generally, and in matters related to Lieutenant Thomas, the Army Armament, Munitions and Chemical Command Inspector General (AMSMC–IG) issued a report on April 12, 1993, which concluded, among other findings, that the military police had attempted to coerce a witness into changing a sworn statement regarding the alleged loan to the plaintiff. The AMSMC–IG report indicated that it had not intended to investigate Lieutenant Thomas' discharge action, but in conducting its inquiry at the depot had called into question several of the initial fourteen reasons for Lieutenant Thomas' discharge, and recommended that the command initiate a specific investigation regarding all of the charges against the plaintiff. The AMSMC–IG report concluded that, "the most significant cause [of the troops' low morale] was the perceived abusive nature of their chain-of-Command to include their use of mass punishment, tolerance for racial discrimination and sexual harassment."

As a result of the AMSMC–IG recommendation, Brigadier General William Holmes, the Deputy Chief of Staff for Ammunition, Army Materiel Command, was appointed by General Benchoff on April 23, 1993, to investigate a number of issues at Sierra Army Depot, including the discharge action against Lieutenant Thomas. After hearing testimony from approximately 40 witnesses, General Holmes concluded that he had found credible evidence to support 7 of the 14 allegations against Lieutenant Thomas, specifically: (1) received $300.00 loan from SPC Glenn, a junior enlisted soldier for personal use; (2) tolerated the repeated showing of pornographic movies; (3) made a trip to Fort Ord

without a pass even after having been told by a superior that she was requested to obtain a pass for such a trip; (4) repeatedly harassed soldiers and used derogatory names; (5) made derogatory statements towards officers and NCOs; (6) incited soldiers to complain to the commander, write to Congress and complain to the IG about duty schedule changes; and (7) slept on duty in the special weapons area. General Holmes concluded that the elimination action against the plaintiff was "soundly based." He also concluded that although Lieutenant Thomas had been hindered in her initial attempts to obtain statements to support her rebuttal, once senior members of the command became aware, the problem had been corrected.

In a memorandum written on May 24, 1993, General Benchoff recommended that Lieutenant Thomas be separated from the Army with a General Discharge (Under Honorable Conditions). This memorandum, entitled "Officer Elimination—2LT Carla Thomas," included six of the seven reasons for discharge recommended by General Holmes. These allegations were:

[1] borrowed $300 from a junior enlisted soldier for personal reasons. [2] Tolerated the repeated showing of pornographic movies to soldiers on duty in the Special Weapons Area and took no affirmative action to ensure it would not happen again. [3] Made a trip to Fort Ord, California, without a pass after being expressly told by her commander that she needed a pass for this trip; and while on this trip, she instructed a junior enlisted soldier who accompanied her to lie for her if she was asked about the trip. [4] Repeatedly harassed soldiers, including NCOs, by calling them derogatory names and embarrassing them in front of the platoon. This harassment also included making comments about some of the soldiers['] wives and asking soldiers about their sex lives in front of others. She repeatedly discussed her sex life in front of groups of soldiers and used vulgar language in these discussions. [5] Repeatedly made derogatory and untrue statements about officers and NCOs, including her commander and her unit's first sergeant. [6] Repeatedly and intentionally slept on duty while in charge

of the Special Weapons Area in violation of the Unit Standing Operating Procedures and disregarded the procedures specifically described by the commander at her request.

General Benchoff's memorandum concludes: "After reviewing the evidence presented, I am convinced that the ... alleged incidents did indeed occur[.]"

Lieutenant Thomas received another negative OER for her performance from October 29, 1992 through June 5, 1993. Shortly thereafter, on August 12, 1993, she received a Letter of Reprimand for failure to maintain sufficient funds in her bank account to cover eight checks and failing to pay her just debts. These two documents (the OER and the Letter of Reprimand) became part of Lieutenant Thomas' Officer's Military Personnel File. The discharge action, however, was not amended to include the dishonored checks as a reason for discharge.

On November 5, 1993, Lieutenant Thomas was issued a General Discharge (Under Honorable Conditions). At the time of her discharge, she had completed two years, four months and twenty-eight days of active military service of her three year active duty commitment. Lieutenant Thomas called the Department of Defense Inspector General Hotline seven days before the discharge was actually issued to complain that she was being eliminated from the Army based on charges which had not been properly investigated.

On November 22, 1993, the Department of Defense Inspector General (DODIG) requested that the Department of the Army Inspector General (DAIG) review its investigation of Lieutenant Thomas. On December 9, 1993, the Department of the Army Inspector General informed DODIG that the circumstances surrounding Lieutenant Thomas' elimination had been fully investigated and that the matter was closed. On October 26, 1994, the DODIG countered that, based upon its review of Lieutenant Thomas' file, "reasonable question exists about the factual adequacy of the findings upon which the elimination action was based." In response, the Department of the Army Inspector General

responded to each point raised by DODIG, ultimately concluding that the action taken against Lieutenant Thomas was supported by the evidence on record. On February 9, 1995 DODIG asserted that it continued to view the investigation as flawed and Lieutenant Thomas' separation as "unduly harsh."

On June 20, 1996, Ms. Thomas petitioned the Army Board for Correction of Military Records (ABCMR), requesting that she be returned to active duty, receive the back pay and allowances she would have received had she been promoted to captain, and have her military record expunged. Each of the reasons for discharge were disputed by the plaintiff at her hearing before the Army Board for Correction of Military Records, more specifically, that: (1) there is no evidence to support the allegation that she borrowed $300 from an enlisted member; (2) she stopped the showing of a pornographic movie and confiscated it; (3) Fort Ord is within the 300 straight mile radius from Sierra Army Depot, and, therefore, her trip to Fort Ord without a pass was allowed (though she admitted the trip was 379 miles by road); (4) the soldiers themselves never felt harassed by her use of derogatory nicknames; (5) she denies making derogatory statements about her commander and first sergeant; and (6) she only slept on duty once and after being told not to sleep on duty she complied. Ms. Thomas and her counsel also raised other allegations before the Board: that her commanding officer attempted to coerce a witness into recanting or changing her sworn statement; that she was unable to gain access to relevant witnesses; General Holmes' investigation found no support for half of the initial allegations against her; the Department of Defense Inspector General found that the Army did not provide sufficient evidence to substantiate the allegations which served as the basis for the elimination action against her; platoon soldiers failed to defend her because of the racial atmosphere created by the chain of command; and the Department of Defense Inspector General deemed her separation "unduly harsh." At the hearing, Ms. Thomas also admitted having written ten dishonored checks and that she had been in violation of the Army's weight standards as indicated in her last OER.

After the Board hearing, attended by Ms. Thomas and her legal counsel, the ABCMR concluded that:

1. The Board (i.e., the four member panel) concludes that the applicant has not shown that the contested OER's contain any serious administrative deficiencies or were not prepared in compliance with applicable regulations and policy. Furthermore, the Board concludes that based on the preponderance of the evidence, the contested OER's appear to represent a fair, objective, and valid appraisal of the applicant's demonstrated performance and potential during the periods in question. Therefore, the Board found no basis for removing the contested OER's from her OMPF [Officer Military Personnel File].

2. Although the evidence of record suggests that a less than adequate command climate existed during the period in question, the Board concludes that command's actions against the applicant were the result of her frequent incidents of a discreditable nature and not the result of arbitrary or capricious acts by command.

3. The Board concludes that the applicant was afforded due process and that the preponderance of the evidence supports the action by command to eliminate her from service. Additionally, the Board finds that her elimination/discharge proceedings were conducted in accordance with applicable law and regulations.

4. Notwithstanding the foregoing, taking cognizance of the command climate in which the applicant was placed, two members (Mr. James T. Lucas and Ms. Margaret K. Patterson) of the Board find that, although proper, her elimination/discharge from service was too harsh. These two members conclude, that as a matter of equity and as an exception to policy, that the applicant's OMPF should be changed to show that on 7 June 1994 (i.e., the date she would have completed her active duty commitment) she was "honorably" discharged under the provisions Army Regulation 635–120 by reason of "completion of active duty commitment"; and that her separation code on her DD Form 214 (Cer-

tificate of Release or Discharge from Active Duty) was "N/A." However, these Board members were of the opinion that the applicant's overall record of service did not warrant consideration for promotion, continuation on active duty beyond her active service commitment date, and or [sic] transfer to the USAR Control Group.

5. In the absence of evidence to the contrary, the Board is to presume administrative regularity in the processing of a case. Two members (Mr. Curtis W. Barbee Jr. and Mr. Thomas N. Kuhn) of the Board find that the applicant and her counsel failed to submit sufficient convincing evidence to overcome their presumption of regularity in her case. The latter Board members conclude that all actions taken against the applicant were both proper and equitable and recommend that her request be denied in its entirety.

6. In view of the foregoing, the Board proposes the following recommendations as options for consideration by the Secretary of the Army or his designee.

*RECOMMENDATIONS:* 1. Two members of the Board (Mr. James T. Lucas and Ms. Margaret K. Patterson) recommend the following:

a. That all of the Department of the Army records related to this case be corrected by showing:

(1) that the individual concerned was "honorably" discharged under the provisions Army Regulation 635–120 by reason of "completion of active duty commitment" on 7 June 1994 (i.e., the date she would have completed her active duty commitment);

(2) that the separation code on her DD Form 214 (Certificate of Release or Discharge from Active Duty) be changed to reflect "N/A;" and

(3) that she receive any back pay and allowances to which she is entitled.

b. That so much of the application as is in excess of the foregoing be denied.

2. Two members of the Board (Mr. Curtis W. Barbee Jr. and Mr. Thomas N. Kuhn) recommend that the applicant's request be denied in its entirety.

The Acting Director of the Board for Correction of Military Records, Karl Schneider, signed the memorandum on behalf of the Secretary of the Army on May 9, 1997, approving the ABCMR's findings and conclusions and granting Ms. Thomas partial relief. Mr. Schneider ordered the plaintiff's personnel records to be upgraded to reflect that she received an Honorable Discharge upon completion of her active duty commitment on June 7, 1994, but declining to reinstate her or grant further relief. The plaintiff thereafter brought suit in this court. The parties have filed cross-motions for judgment on the administrative record.

## DISCUSSION

The plaintiff argues that the decision of the ABCMR was arbitrary and capricious, and should be set aside. The defendant argues that the case raises nonjusticiable questions which are beyond the competency of this court, or, in the alternative, argues that the decision of the Secretary of the Army should be allowed to stand.

The parties have filed cross motions seeking judgment on the administrative record, and RCFC 56.1 treats such motions as motions for summary judgment under RCFC 56(a). *Nickerson v. United States,* 35 Fed. Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255, 1997 WL 177509 (Fed.Cir.1997). Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party must demonstrate that the moving party is entitled to judgment as a matter of law and that there are no genuine issues of material fact. *Adickes v. S.H.*

*Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.,* 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. 674, 679 (1990), *aff'd,* 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lane Bryant, Inc. v. United States,* 35 F.3d 1570 (Fed.Cir.1994). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment is appropriate when the sole dispute concerns the interpretation of a government contract, a question of law. *See Olympus Corp. v. United States,* 98 F.3d 1314, 1316 (Fed.Cir.1996).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Company v. United States,* 157 F.3d 849, 854 (Fed.Cir.1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In such a case, there is no need for the parties

to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Hunt v. Cromartie,* 526 U.S. 541, 552–54, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed. Cir.1998), *reh'g denied* (1998); *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985). In the case of parties making cross-motions for summary judgment, each motion must be judged independently and the court must view the evidence in the light most favorable to the other party. *See Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir. 1987).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied* (1995); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States,* 20 Cl.Ct. at 679.

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party will need to go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Neither party has argued that there are material facts in dispute in the case. After an examination of the record and the parties' pleadings, the court agrees. Therefore, this case is ripe for judgment on the administrative record.

■ The United States Court of Appeals for the Federal Circuit has advised that "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States,* 719 F.2d 1153, 1156 (Fed.Cir.1983) (citations omitted). The Federal Circuit has reaffirmed the rule, stating that: "When called upon to review a decision of a corrections board, or of a Secretary taken upon recommendation from a corrections board, the standard of review is whether the decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." *Porter v. United States,* 163 F.3d 1304, 1312 (Fed.Cir.1998) (citing *Skinner v. United States,* 219 Ct.Cl. 322, 594 F.2d 824 (1979)), *reh'g denied* (1999), *cert. denied,* — U.S. ——, 120 S.Ct. 41, 145 L.Ed.2d 37 (1999). Thus, judicial review is available, but is limited to an "arbitrary or capricious" standard. The Federal Circuit in *Porter* cited the United States Court of Claims decision in *Skinner v. United States* as to the standard of review. The court in *Skinner* advised that:

It takes more than an unfair rating or simple injustice to merit our consideration or judicial relief. It must be an unlawful act made so by violation of statute, or regulation, or published mandatory procedure, or unauthorized act, or so unsupported by the evidence as to be a gross injustice, unlawful because of clear legal or factual error, manifest abuse of discretion, or arbitrary and capricious action amounting to bad faith or fraud, and seriously prejudicial.

*Skinner v. United States,* 594 F.2d at 830 (citations omitted). "Substantial evidence" is defined as, "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *see also Jennings v. Merit Sys. Protection Bd.,* 59 F.3d 159, 160 (Fed. Cir.1995); *Heisig v. United States,* 719 F.2d at 1156 (discussing substantial evidence).

■ The burden of proof is on the plaintiff. As stated in a recent Court of Federal Claims decision:

The plaintiff bears the burden of showing that the AFBCMR's [Air Force Board for Correction of Military Records] action was arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations. *Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed.Cir.1986). To prevail under the arbitrary and capricious standard, plaintiff must demonstrate that evidence was ignored or unreasonably construed, or that designated duties were not performed by the AFBCMR. Moreover, "plaintiff must overcome the presumption that 'administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith.'" *Chayra v. United States,* 23 Cl.Ct. 172, 178 (1991), quoting *Sanders [v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979)]. "While the court might disagree with the board's decision, it cannot substitute its own judgment for the board's if reasonable minds could reach differing resolutions of a disputed fact." *Chayra,* 23 Cl.Ct. at 178–179.

*Fluellen v. United States,* 44 Fed.Cl. 97, 101 (1999) (selected citations omitted). A service member is bound by the decision of a correction board, unless the service member "can demonstrate by 'cogent and clearly convincing evidence that the correction board acted

arbitrarily, capriciously, contrary to law, or that its determination was unsupported by substantial evidence.'" *Dodson v. United States*, 988 F.2d 1199, 1204–05 (Fed.Cir. 1993), *reh'g denied* (1993) (citations omitted). The Federal Circuit in *Dodson* noted that: "The boards may also be reviewed for failure to correct an alleged injustice where factual, rather than legal, error has been committed by the military and the error is so shocking to the conscience that boards' failure to correct it rises to the level of legal error." *Id.* at 1204 n. 6 (citations omitted). *See also Doe v. United States*, 132 F.3d 1430, 1433–34 (Fed.Cir.1997); *Arens v. United States*, 969 F.2d 1034, 1037 (Fed.Cir.1992), *reh'g denied* (1992); *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed.Cir.1986); *Gallucci v. United States*, 41 Fed.Cl. 631, 643 (1998); *Krauss v. United States*, 40 Fed.Cl. 834, 838 (1998), *aff'd*, 185 F.3d 886, 1999 WL 132208 (1999) (table); *Garcia v. United States*, 40 Fed.Cl. 247, 252–53 (1998).

As a probationary officer with less than five years of active service, Lieutenant Thomas was not entitled to a hearing at the time of her elimination, as indicated by Army Regulation 635–100, 5–32b(1), "Processing of recommendations for elimination of officers under this section does not require referral to a board of inquiry or a board of review . . . ." The Federal Circuit has noted that: "By statute a commissioned officer proposed for discharge is assured a pre-discharge hearing before a board of inquiry, except for officers in 'probationary' status. An officer with less than five years of service is described as probationary. For such officers, the statute delegates regulatory authority to the agency. As implemented by the Secretary of the Army for this category of officer, no hearing before a board of inquiry is offered unless the discharge is upon other than honorable conditions." *Holley v. United States*, 124 F.3d 1462, 1467 (Fed.Cir.1997), *reh'g denied* (1997). Since her original discharge was a General Discharge (Under Honorable Conditions), Ms. Thomas was not entitled to a hearing. As a probationary officer discharged under honorable conditions, Ms. Thomas was afforded the opportunity to submit a rebuttal of the Army's accusations during the elimination process, a

right she exercised. Ms. Thomas was, however, afforded a hearing before the ABCMR, where she appeared with counsel.

The Board decision is summarized in a Memorandum, dated May 9, 1997, and signed on behalf of the Secretary of the Army by Karl F. Schneider, Acting Director for the Army Board for Correction of Military Records. The memorandum states:

Having approved the findings, conclusions and recommendation of the Army Board for Correction of Military Records, and under the provisions of Title 10, United States Code, section 1552, it is directed:

1. Under the authority of Title 10, United States Code, section 1552, the recommendation of the Army Board for Correction of Military Records granting partial relief is hereby accepted and approved, and it is directed that all the Department of the Army records of the individual concerned be corrected as shown in paragraph # 1 under Recommendations in the Proceedings of the Board in this case.

2. Relief is granted as an exception to policy based on the poor command climate within the applicant's command and the lack of men—toring [sic] and guidance provided to the applicant in a challenging assignment. Further relief is not warranted, given the applicant's admitted misconduct.

3. Request necessary administrative action be taken to effect the correction of records as indicated. Further, request that the individual concerned and counsel, if any, as well as any members of Congress who have shown interest be advised of the correction and that the Board for Correction of Military Records be furnished a copy of the correspondence.

4. Furnish the Defense Finance and Accounting Service–Denver Center, ATTN: Claims Branch–FYDEC, 6760 East Irvington Place, Denver, CO 80279–7000, a copy of your letter of notification to the individual concerned so that settlement of any monies due may be accomplished.

The conclusions of the Board report indicate that Lieutenant Thomas "did not warrant consideration for promotion, continua-

tion on active duty beyond her active service commitment date, and or [sic] transfer to the USAR Control Group." The four-member panel also concluded the plaintiff failed to prove serious administrative deficiencies in her OERs, and that the OERs "represent a fair, objective and valid appraisal of the applicant's demonstrated performance and potential during the periods in question." According to the Board, the command's actions were the result of the plaintiff's "frequent incidents of a discreditable nature and not the result of arbitrary or capricious acts by the command." Finally, the Board concluded that Lieutenant Thomas "was afforded due process and that the preponderance of the evidence supports the action by the command to eliminate her from service," and that "her elimination/discharge proceedings were conducted in accordance with applicable law and regulations."

Two of the Board members further concluded that: "all actions taken against the applicant were both proper and equitable and recommend that her request be denied in its entirety." The other two Board members, however, believed that, "taking cognizance of the command climate in which the applicant was placed, . . . although proper, her elimination/discharge from service was too harsh." These two members recommended that: "as a matter of equity and as an exception to policy, that the applicant's OMPF [Officer Military Personnel File] should be changed to show that on 7 June 1994, (i.e., the date she would have completed her active duty commitment) she was 'honorably' discharged . . . ."

The recommendation section reflected the split on the Army Board for Correction of Military Records, not regarding whether plaintiff should have been discharged, but whether to upgrade plaintiff's discharge as a matter of equity:

*RECOMMENDATIONS:*

1. Two members of the Board (Mr. James T. Lucas and Ms. Margaret K. Patterson) recommend the following:

a. That all of the Department of the Army records related to this case be corrected by showing:

(1) that the individual concerned was "honorably" discharged under the provisions Army Regulation 635–120 by reason of "completion of active duty commitment" on 7 June 1994 (i.e., the date she would have completed her active duty commitment);

(2) that the separation code on her DD Form 214 (Certificate of Release or Discharge from Active Duty) be changed to reflect "N/A;" and

(3) that she receive any back pay and allowances to which she is entitled.

b. That so much of the application as is in excess of the foregoing be denied.

2. Two members of the Board (Mr. Curtis W. Barbee Jr. and Mr. Thomas N. Kuhn) recommend that the applicant's request be denied in its entirety.

Following the ABCMR decision and the document signed by Acting Director Schneider on behalf of the Secretary of the Army on May 9, 1997, the plaintiff's November 5, 1993 separation form on which the "Character of Service" read "Under Honorable Conditions (General)" and the "Narrative Reason for Separation" read "Unacceptable Conduct," were revised in accordance with the Board's findings to read "Honorable" discharge with the reason for Lieutenant Thomas leaving the service as the "Completion of Active Duty Commitment [on June 7, 1994]."

■ The six allegations made against Ms. Thomas in General Benchoff's May 24, 1993 recommendation for discharge were considered by the ABCMR. The reasons for the discharge action were:

[1] borrowed $300 from a junior enlisted soldier . . . . [2] Tolerated the repeated showing of pornographic movies to soldiers on duty in the Special Weapons Area . . . . [3] Made trip to Fort Ord, California, without a pass . . . . [4] Repeatedly harassed soldiers, including NCOs, by calling them derrogatory [sic] names . . . . [5] Repeatedly made derrogatory [sic] and untrue statements about officers and NCOs, including her commander and her unit's first sergeant. [6] Repeatedly and intentionally slept on duty . . . .

Ms. Thomas has denied all of the six charges, and argues that the Board's decision was arbitrary and capricious, citing deficiencies in the investigations, deficiencies in the "command climate" at the Sierra Army Depot, and criticism by the Department of Defense Inspector General's office of the discharge action. Ultimately, however, because the record provided to the court does not substantiate the plaintiff's assertions, Ms. Thomas has failed to carry her burden of proof and to clearly establish that the Board and Secretary's decisions were arbitrary and capricious.

Allegation No. 1, regarding the loan of $300.00 to an enlisted member, was contradicted by a statement of SPC Youlanda Glenn, the alleged provider of the loan, when she wrote in a affidavit, "2LT Thomas, Carla did not ask nor borrow $300.00 from me at any time." This sentence was the extent of the affidavit, which was sworn to before Lieutenant Thomas herself. Plaintiff notes that the Office of the Inspector General for the Army Armament, Munitions and Chemical Command concluded that the Military Police had attempted to coerce SPC Glenn into changing her sworn statement pertaining to the $300.00 loan. However, in support of the allegation that SPC Glenn, in fact, made the loan, the Army points to findings in the Department of the Army Inspector General's memorandum dated January 26, 1995:

A review of all the evidence collected shows that SPC Glenn, the enlisted soldier involved, first admitted to Mr. Culver, a civilian attorney at Sierra Army Depot, that she did, in fact, loan $300.00 to 2LT Thomas. Further, testimony from SGT Winters and SSG Gay confirmed that SPC Glenn asked SGT Winters, an NCO in her chain of command, for advice on how to collect the $300.00 owed to her by 2LT Thomas. In sworn testimony dated May 8, 1993, SPC Victor Gray related to BG Holmes a conversation he had with SPC Glenn. In particular, SPC Glenn told SPC Gray that 2LT Thomas asked SPC Glenn to write a statement denying that she lent $300.00 to 2LT Thomas because "she needed it, so she wouldn't get in trouble for it." It was SPC Gray's impression that 2LT Thomas pressured SPC Glenn to write the new statement, saying, "Yeah, you're my friend. You gotta write this for me or else I'm going to be in trouble."

In light of those facts, the Commander, Sierra Army Depot stated on 4 March 1993 that he could not "assign any credibility to SPC Glenn's statement, sworn and witnessed by 2LT Thomas, that she never loaned money to 2LT Thomas." That assessment is supported by the record.

The AR 15–6 investigation conducted by BG Holmes looked carefully at the allegation that 2LT Thomas' commander attempted to coerce SPC Glenn into changing her sworn statement regarding the allegation. Testimony revealed that the commander asked SPC Glenn to "tell the truth" and not to "change her statement." Given SPC Glenn's earlier statement to Mr. Culver and supporting testimony from SGT Winters and SSG Gay, as detailed above, the Commander's actions in questioning the veracity of SPC Glenn's subsequent statement were not unreasonable. The "First Version" of SPC Glenn's testimony was credible and corroborated by independent evidence. A preponderance of evidence supports the finding that 2LT Thomas improperly borrowed $300.00 from a subordinate enlisted soldier.

With respect to this first reason for the discharge action, though disputed by the plaintiff, the record provides a reasonable basis for the conclusion that an improper loan was made to a subordinate by 2LT Thomas, and that Army personnel did not improperly attempt to coerce the provider of the loan into providing a false statement.

Allegation No. 2, concerning pornographic movies, is also the subject of contradictory statements from members of the Third Platoon. The statements from soldiers included these: "While working in the SW [Special Weapons] Area porno's were viewed by soldiers; without the approval of the Lt's permission. She had stated that no porno tapes were to [be] watched in the SW Area."; "I had never seen the Lt. watch pornographic materials with soldiers ... she did not approve of watching pornographic movies on duty."; "I have never viewed pornographic movies with LT. Thomas present or with the

[sic] knowing about the movies." Other sworn statements, however, implicated Lieutenant Thomas: "I have seen her sit there and watch a porno for a few mins."; "On ocation [sic] Lt Thomas has viewed pornographik mivies [sic] with the platoon in the day room."; "On at least three times that I can remember porno tapes have been brought out to the SW Area. I do recall seeing her in the training room watching them on at least on[e] occasion."; "While in the SW Area she has either watched or has knowledge that soldiers were watching pornography in [the] training room."; "Also there was one occ[a]sion that a soldier brought out a[p]orno tape, and she made everybody who was doing nothing, go up and watch it with her."; "I for a fact know she knew about the porno tapes in the SWA because she watched them with us."

The Department of the Army Inspector General, in reviewing the witness statements, concluded that a review of all of the evidence indicated that Lieutenant Thomas: "(a) knowingly allowed the viewing of pornographic movies, (b) herself watched pornographic movies with her soldiers, and (c) on at least on one occasion, actively encouraged on duty soldiers who had nothing to do at the time to watch a pornographic movie with her." With respect to this second reason for the discharge action, though disputed by the plaintiff, the record provides a reasonable basis for the conclusion that Lieutenant Thomas tolerated and even watched pornographic movies with her soldiers.

Allegation No. 3 concerned the absence of a pass to travel to Fort Ord. Ms. Thomas admitted at the hearing before the Board having traveled to Ft. Ord without a pass. The rules at Sierra Army Depot state, "Personnel desiring to travel in excess of 300 miles must have a valid pass in their possession." The rules do not define "miles." The record reflects that Ft. Ord is 283 "straight line" miles from the depot, but 379 miles by automobile. Lieutenant Thomas' first commander at the depot, Captain Robert McNeil, wrote: "I was fully aware of her trips to Ft. Ord to visit her fiancee. I never required a formal pass or permission; I simply required that she provide me with a telephone num-

ber.... CPT Grams was aware of LT Thomas' trips to Ft. Ord."

However, Captain Grams, in a September 22, 1992 letter of counseling to Lieutenant Thomas, stated:

Upon returning to the company area on 19 Sep [92] you called me to verify that you did not need a pass to go to Ft. Ord. I replied that according to policy you must submit and receive a pass if you are traveling outside the 300 mile limit. You initially stated that you did not understand why you couldn't just leave me a phone number. I informed you that maybe you had a special arrangement with your previous commander, but according to policy, you would submit a pass request with the name, address and phone number of the person you would be staying with. You appeared to have a serious problem with submitting the pass request. You then stated that you no longer need a pass because you had suddenly changed your mind and you were only going to travel as far as San Francisco. I have reason to believe that you had every intention and did in fact go to Ft. Ord after you specifically told me you were not going.

The Department of Army Inspector General wrote in its January 26, 1995 memorandum: "The evidence strongly indicates 2LT Thomas understood Fort Ord to be outside the 300 mile limit set by the commander's policy .... Lieutenant Thomas could not have returned to duty 'as the crow flies;' she would have had to travel the full 379 road miles. A pass was required." Lieutenant Thomas traveled 379 miles to Ft. Ord by automobile. With respect to the third reason for the discharge action, though disputed by the plaintiff, the record provides a reasonable basis for the conclusion that Lieutenant Thomas improperly traveled to Ft. Ord without a pass.

Allegation No. 4 states that Lieutenant Thomas "[r]epeatedly harassed soldiers, including NCOs, by calling them derrogatory [sic] names, and embarrassing them in front of the platoon. This harassment also included making comments about some of the soldiers [sic] wives and asking soldiers about their sex lives in front of others. She re-

peatedly discussed her sex life in front of groups of soldiers and used vulgar language in these discussions." This allegation was supported by the sworn statements of numerous soldiers. Typical statements included: "On many occasions LT Thomas has asked soldiers about their sex life; I distinctly reme[m]ber her asking me how long it had been since I last had sex.... I have personally heard LT Thomas make comments of her sex life on many occasions while in the company of other soldiers."; "She [i]nsults wives and girlfriends of anyone she doesn't like[.] She has called peoples [sic] wives [obscene words].... She talks about her sex life with other soldiers. She will ask soldiers have you ever [had sex in a certain position]"; "I have heard her refer to her sex life .... 2LT Thomas has refer[r]ed to other sex lives.... I have he[a]rd 2LT Thomas call other [soldiers'] wives and girl friends [obscene words]"; "LT Thomas does in[su]lt the soldiers by calling them [obscene word]"; "I have heard LT Thomas insult certain soldiers...."; "[S]he referred to me as [nickname]. For a while it seemed OK as a joke until she took it to extremes and often times belittled me in front of other platoons, especially 5th platoon, by calling me that."

Not all soldiers were offended: "LT. Thomas never offended me with my nickname, that she gave me ....."; "I don't consider them [nicknames] insulting because they don't bother me"; "I whas [sic] never offended by a nickname from 2nd Lt. Thomas." The record reflects, however, that the plaintiff's language was perceived as harassment by many of her subordinates. General Benchoff stated, "Perhaps the greatest area of deficiency in the MPU [Military Police Unit] is in the ability of the command to establish and enforce acceptable limits on the language that is used by service members within the command.... [T]he language used by soldiers assigned to the MPU is very often sexually explicit, vulgar and offensive." The Department of the Army Inspector General concluded that:

> At least seven statements from platoon soldiers established that 2LT Thomas, put in a position of leadership as platoon leader, publicly demeaned her own soldiers and, in some instances, her soldiers' spous-

es, by using profanity .... Virtually every member of 2LT Thomas' platoon indicated that name-calling, swearing, and referring to superior and subordinate soldiers, and soldiers' spouses in profane terms, was a way of life for 2LT Thomas. Her actions demonstrated that 2LT Thomas failed to perform in her role as a leader, thereby permitting a hostile environment to exist in violation of Army command policy and Army equal opportunity and sexual harassment rules and regulations. Over half a dozen statements indicate that 2LT Thomas intentionally called soldiers names and fostered an environment where profanity and harassment were acceptable.

With respect to this fourth reason for the discharge action, though disputed by the plaintiff, the record provides a reasonable basis for the conclusion that Lieutenant Thomas made improper, harassing comments in her platoon.

Allegation No. 5 is that Lieutenant Thomas: "Repeatedly made derrogatory [sic] and untrue statements about officers and NCOs, including her commander and her unit's first sergeant." A number of sworn statements supported this allegation. Typical statements were that: "I have heard her refere [sic] to the [First Sergeant] using bad language, such as [obscene words].... I have heard LT Thomas call LT Pickering a [obscene word] or words to that effect behind her back while in the company of both second and third platoon soldiers."; "She (2LT Thomas) has made derogitory [sic] comments t[o]wards the company commander[,] First Serge[a]nt ..., Post commander i.e., [obscene words]. She has also refer[r]ed to NCO's as [obscene words]. Publicly."; "LT Thomas also stated that the commander was [obscene word] [the First Sergeant] at all hours of the night .... She stated that [the company commander] was [obscene word] privates .... She also stated in front of PLT [platoon] that our PLT SGT is no good and is i[n]comp[e]tent for his job[.] She also talks badley [sic] about the whole chain of command in front of privates....."; "I also heard LT. Thomas make insults towards the 1st Sergeant."

With respect to this fifth reason for the discharge action, though disputed by the plaintiff, the record provides statements similar to those supporting allegation no. 4, and similarly provides a reasonable basis for the conclusion that Lieutenant Thomas made improper statements about officers and NCOs, including her company commander and first sergeant.

Allegation No. 6 states that Lieutenant Thomas: "Repeatedly and intentionally slept on duty while in charge of the Special Weapons Area in violation of the Unit Standing Operating Procedures and disregarded the procedures specifically described by the commander at her request." The Unit Standing Operating Procedures are contained in Sierra Army Depot Special Order No. 1, dated October 2, 1991. The Special Order provides that soldiers may take a short nap of 45 minutes to an hour to refresh the soldier and increase alertness. However, the Special Order also provides that "MP–1's [Duty Officer's] may not sleep." The record supports allegation no. 6. Soldiers stated that: "I know by LT Thomas' own words that she has slept in the SWA almost all night on almost all mid shifts."; "On almost every mid shift she will go to sleep on the little cot behind the [panel] in the control room from 0000 hrs. to 0430 hrs."; "She sleeps on almost every mid." Two sworn statements named two other lieutenants who also slept on duty. The plaintiff indicated that she slept on duty with the prior approval of her company commander, but did not provide a statement from that company commander to support her assertion. The plaintiff also argued that all Duty Officers slept on duty.

The Department of the Army Inspector General stated that:

> The duty involved here was not routine such that sleeping during night shift was a *de minimis* violation. The officer-in-charge of security in a Special Weapons area has responsibility to provide site security for a large stockpile of extremely sensitive and lethal special weapons. The officer-in-charge exercises authority over soldiers on roving patrol in the SWA and those soldiers in the command post who monitor complex security systems. Sleep-

ing on duty in this situation presents an unacceptable danger.

> CPT Grams, 2LT Thomas' company commander, explained in detail the procedures to transfer MP–1 duties to the platoon sergeant before she could sleep. The standing operating procedures (SOP), which 2LT Thomas should have read, confirmed CPT Grams' testimony that 2LT Thomas knew the rules. The following UNCLASSIFIED information is contained in Special Order Number 1 which describes the duties of the MP–1: "the duty officer (MP–1) will NOT sleep." Private First Class Duncan testified he, too, told 2LT Thomas abut the SOP prohibition against her sleeping on duty .... 2LT Thomas slept on duty while in charge of security of a Special Weapons area after knowing of the SOP, after being told the rules by CPT Grams, and after being reminded of the rules by PFC Duncan.

(Emphasis in original.) With respect to this sixth reason for the discharge action, though disputed by the plaintiff, the record provides a reasonable basis for the conclusion that Lieutenant Thomas slept on duty without permission, while in charge of security for a Special Weapons Area.

The reasons for discharge are supported by substantial evidence in the record, The plaintiff, however, argues that the adverse matters in her military records stand in marked contrast to Plaintiff's first officer evaluation by a preceding commander which praised her performance as "unequivocally distinguished" and "one of the best." The favorable evaluation covering the plaintiff's first six months on active duty was contained in her military records, and was specifically noted by the ABCMR report. The favorable evaluation was weighed against the subsequent adverse documentation by the ABCMR, with the Board concluding "that command's actions against the applicant were the result of her frequent incidents of a discreditable nature and not the result of arbitrary or capricious acts by command."

The plaintiff noted that General Holmes, investigating the allegations against Lieutenant Thomas for the Army Depot Systems Command, "found that Plaintiff's chain of

command had hindered her in her attempt to obtain statements for use in rebutting her elimination ...." The plaintiff did not note General Holmes' very next sentence: "However, as soon as senior members of the chain-of-command became aware of this issue, the situation was corrected to 2LT THOMAS' satisfaction."[2] Plaintiff, in fact, does not cite any specific statements she was unable to obtain to defend against the discharge action.

Plaintiff also noted that General Holmes "attributed many of Plaintiff's problems to a poor NCO (noncommissioned officer) chain of command and lack of adequate guidance from senior officers in her chain ...." General Holmes, however, came to a different conclusion: "Many of 2LT THOMAS' actions can be attributed to having a weak Platoon Sergeant and her perception that to be effective she had to be 'one of the soldiers.' This is certainly no excuse since another 2LT (2LT HEINLEIN) had the same Platoon Sergeant when he arrived in the unit a year earlier and did not have the same sort of difficulties." General Holmes, in fact, concluded that all of the reasons ultimately used as a basis for the discharge action against Lieutenant Thomas "appear[ed] to be soundly based."

Plaintiff also notes that the Department of Defense Inspector General's office questioned the factual adequacy of the allegations supporting the discharge action, and described the discharge action as "unduly harsh." The conclusion of the IG office was that "LT Thomas at most made some 'second lieutenant mistakes' and did not receive the counselling, rehabilitative transfer and good mentoring by which the Army has traditionally provided guidance to its new officers." The decision to discharge, or to retain and rehabilitate is a military decision. This court does not substitute its judgment on such military personnel decisions for that of the discharge authority, the ABCMR, or the Secretary of the Army. As the Federal Circuit stated in *Heisig v. United States:*

> It is ... settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence. Thus, although judicial review of military service determinations with monetary consequences is available, the review jurisdiction has been summarized:
>
> > [R]eview of the administrative decision is limited to determining whether the * * * action was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which [the complainant] has been seriously prejudiced. [Citations omitted.]
>
> *Clayton v. United States*, 225 Ct.Cl. 593, 595, 1980 WL 13179 (1980).

*Heisig v. United States*, 719 F.2d 1153, 1156 (Fed.Cir.1983).

Ms. Thomas also stated, at the hearing before the ABCMR, that a majority of the soldiers did not come to her defense, but wrote statements against her,

> [b]ecause of the command. The command there was very harsh and very cruel, particularly to soldiers that hung around with black soldiers. If you were a white soldier, and you hung with a black soldier, the first sergeant considered you a wigger, which was a white [obscene word]. If I had been one of those soldiers who was

---

2. General Holmes' report stated that:

27. LT Thomas, through her complaints to the various IG offices and through her legal counsel, made allegations that command officials at SIAD had denied her the right to take statements from soldier [sic] in the MPU, and by implication had perhaps coerced these soldiers into not making statements on LT Thomas' behalf. Mr. Culver has acknowledged that early on there was a problem in this regard which was caused by her counsel contacting soldiers in the SWA while they were on duty and the command did not want this to occur. Mr. Culver stated that he offered to make arrangements for all soldiers that LT Thomas or her counsel wanted to contact or interview, but her counsel did not avail himself of this offer. It is my understanding that this matter is now completely resolved and LT Thomas and her counsel, CPT James J. Schaefer, are now capable of interviewing any soldier at SIAD and requesting that soldier to make a statement on her behalf.

called into a room and directed to rite [sic] a statement against a lieutenant, to be honest with you, I would have done it, too, because if you didn't do it, your life would have been a living nightmare at Sierra Army Depot.

In support of this argument, Ms. Thomas' attorney, in a written submission to the ABCMR, stated that:

On 16–19 March 1993, LTC Acree and Ron Clark of AMC COM IG visited SIAD and conducted an investigation of the Company Commander. In the course of their investigation, they discovered information pertaining to 2LT Thomas. It is believed that their investigation confirms many of the injustices against 2LT Thomas. Specifically it is believed that some of the findings relevant to this case are as follows: (1) There was racial discrimination against 2LT Thomas, who is an African American female, and others (*i.e.,* selective enforcement of regulations along racial grounds)[.]

The Inspector General Report cited above by the plaintiff's counsel states that:

[T]he soldiers assigned to the MPU exhibited low morale. This low moral is attributed in part to their long work hours; their geographical isolation and the lack of public transportation to entertainment and shopping facilities; the limited availability of base support and Morale, Welfare, and Recreation facilities caused by their diverse work hours. However, the most significant cause was the perceived abusive nature of their chain-of-Command to include their use of mass punishment, tolerance for racial discrimination and sexual harassment.

. . . .

During the Sensing Seminars, when asked, "If you could change one thing at SIAD, what would it be?", virtually all of the enlisted soldiers who were assigned . . . stated that they would change the Chain of

Command. When asked why, nearly all of them responded that [deleted] were abusive, intimidating, and coercive in their treatment of subordinates.

. . . .

(k) Soldiers alleged that racism and sexual harassment were prevalent in the unit. They cited instances in which white soldiers who were married to or dating or had black friends were called "wigger" (meaning white [obscene word] ).

. . . .

b. Processing of Equal Opportunity complaints that had been submitted by 2LT Thomas . . . were being properly addressed by the EO Officer. . . . Second Lieutenant Thomas' case was initially being worked by [deleted]. He stated that she has withdrawn her case and intended to submit it again through DESCOM EO or higher Headquarters.

The Inspector General Report, cited by the plaintiff's attorney, recommended an investigation into the discharge action against Lieutenant Thomas. The follow-on investigation was conducted, as noted earlier, by General Holmes, who concluded that "[n]o instances of racial discrimination were substantiated, but interviews revealed numerous instances of what could be perceived as a hostile environment for female soldiers." General Holmes, in fact, concluded that the sexual harassment of three female soldiers (not including Lieutenant Thomas) had been substantiated, and that disciplinary action should be taken against the offending male soldier;[3] that further investigation was needed to determine if another female soldier (not Lieutenant Thomas) had been subjected to a hostile environment; that there was no credible evidence that another female soldier (not Lieutenant Thomas) had been the victim of gender discrimination; that no evidence was found of false statements being made in the Military Police Unit;[4] and that the discharge

---

**3.** The statement of the offending soldier was included in the record, but was not considered by the court.

**4.** General Holmes noted that an earlier investigation by Captain Paschke of the legal office had indicated that one soldier "appeared to be biased

against LT Thomas," and another "also appeared to be adamant against LT Thomas." Neither of these statements were relied on by the court. Captain Paschke stated that the soldiers he interviewed did not appear to be motivated by racial bias, other than these exceptions, but were concerned instead about the misconduct of Lieuten-

action against Lieutenant Thomas appeared to be soundly based, with evidence to substantiate seven of the allegations (ultimately, six of the seven became the basis of her discharge), and that the other allegations against Lieutenant Thomas required further investigation before being used as a basis for discharge (the other allegations were not pursued in her discharge action). After a careful review of the record and the pleadings, the plaintiff has not substantiated that her discharge action was based on racial discrimination.

The defendant argues that there were reasons for discharge, acknowledged by the plaintiff—other than the reasons actually used—which would provide a separate basis for the adverse action. Lieutenant Thomas received a letter of reprimand on August 12, 1993, after initiation of the discharge action, for drafting eight dishonored checks, and failing to timely pay three other debts. In two officer evaluation reports covering the period September 1991 through June 1993, the second report executed after initiation of discharge action, comments were included which reflected that Lieutenant Thomas was not in compliance with Army weight and body fat standards. The letter of reprimand and officer performance reports were part of the plaintiff's record which was reviewed by the ABCMR. Defendant argues that Army regulations provide that an officer "may be eliminated for the discreditable or intentional failure to meet personal financial obligations," and also provide for the elimination from the service "for failure to maintain required weight and body fat standards." "Consequently, Ms. Thomas could have been eliminated from the Army on these undisputed charges . . . ."

Plaintiff responds that her "admitted failure to maintain adequate funds to cover several checks and to maintain Army weight standards cannot be retroactively cited to provide a basis for her elimination." The six reasons ultimately providing the basis for Lieutenant Thomas' discharge, however, do not include dishonored checks or failure to maintain weight standards. In fact, as noted

above, the letter of reprimand citing dishonored checks, and the second officer performance report reflecting the continued failure to maintain weight standards, were both subsequent to the initiation of discharge action, and were only a matter of three months (the reprimand) and five months (the performance report) prior to Lieutenant Thomas' discharge from the Army.

Army Regulation 635–100, titled "Personnel Separations: Officer Personnel," (May 1, 1989), provides at paragraph 5–14b that prior to the elimination of an officer, the officer will be advised

of the reasons supporting the elimination and the factual allegations supporting the reasons. Only applicable reasons as outlined in paragraph 5–10 [substandard performance of duty] and/or 5–11 [misconduct, or moral or professional dereliction] which can be supported by specific factual allegations and evidence may be the basis for elimination. Evidence to support the elimination must be able to stand on its own merits.

(Citations omitted.) The plaintiff has not alleged that her commander violated the regulation providing for notice to an officer identified for consideration of elimination from the service prior to completion of the officer's active duty commitment. There is no indication in the record that dishonored checks or weight standards were employed by Lieutenant Thomas' commander as reasons for the discharge action. In fact, extensive Army investigations winnowed the initial list of fourteen reasons supporting the discharge action down to a list of seven reasons, and then to the six reasons ultimately relied on by the Army to support the discharge action, none of which involved checks or weight.

Army Regulation 635–100, paragraphs 1–5 and 1–6, provides that, for officers discharged, the character of service as reflected on discharge certificates shall be either Honorable, General (Under Honorable Conditions), or Under Other Than Honorable Conditions. "The character of discharge shall be predicated on the officer's behavior and performance of duty while a member of a Mili-

ant Thomas. General Holmes concurred with Captain Paschke's views on those soldiers who

appeared to be biased against Lieutenant Thomas.

tary Service." *Id.* at ¶ 1–5. "Behavior" and "duty performance" are broad categories, warranting scrutiny of an officer's entire military record, including, for example, Lieutenant Thomas' initial favorable performance report and subsequent adverse information, to properly characterize her service.[5]

Plaintiff does not indicate that the subsequent adverse information was in error. Plaintiff and her attorney were afforded an opportunity to address the subsequent adverse information at the ABCMR hearing, and attempt to demonstrate why that information was in error or why the information was not properly part of her military records. Plaintiff, in fact, explained to the Board that the dishonored checks resulted from heavy expenses on legal fees in connection with the discharge action; that her height measurements fluctuated, affecting the her weight standard; that different weight scales produced different results; and that on one occasion she was overweight by the scales, but met the alternative tape measurement test. At the end of the hearing, plaintiff was afforded an opportunity to provide a final input to the Board, but declined to do so. After reviewing the plaintiff's entire military record, including favorable as well as unfavorable information, two Board members recommended an upgrade of the plaintiff's character of discharge to Honorable, a recommendation adopted by the Secretary.

Furthermore, ABCMR regulations provide that:

(5) *Consideration of application.* (i) Each application [to the Board] and the available military or naval records pertinent to the corrective action requested will be reviewed to determine whether to authorize a hearing, recommend that the records be corrected without a hearing, or to deny the application without a hearing.

. . . .

(ii) The Board may deny an application if it determines that insufficient relevant evidence has been presented to demonstrate the existence of probable material error or injustice.

. . . .

(v) The brief statement of the grounds for denial [of an application] shall include the reasons for the determination that relief should not be granted, including the applicant's claims of constitutional, statutory and/or regulatory violations rejected, together with all essential facts upon which the denial is based, including, if applicable, factors required by regulation to be considered for determination of the character of and reasons for a discharge.

32 C.F.R. § 581.3(c)(5)(i), (ii), (v) (1996). The Board reviews the applicant's entire military record to determine whether to grant a hearing (one was granted in this case); to assist the Board in its determination of the existence of probable material error or injustice (insufficient evidence of error or injustice was found in this case); and whether the appropriate character of discharge has been assigned (the recommendation of two Board members in this case, to upgrade the charac-

---

**5.** *Cf.* 32 C.F.R. Part 41, App. A, Part 2.C.2.a.(1) (1996) (Office of the Secretary of Defense guidance for enlisted members): "Characterization at separation shall be based upon the quality of the member's service, including the reason for separation...."; Part 2.C.2.b.(1): "The Honorable characterization is appropriate when the quality of the member's service generally has met the standards of acceptable conduct and performance of duty for military personnel, or is otherwise so meritorious that any other characterization would be clearly inappropriate."; Part 2.C.2.b.(2): "If a member's service has been honest and faithful, it is appropriate to characterize that service under honorable conditions. Characterization of service as General (under honorable conditions) is warranted when significant negative aspects of the member's conduct or performance of duty outweigh positive aspects of

the member's military record."; Part 2.C.2.c.: "[C]haracterization will be determined solely by the member's military record during the current enlistment or period of service to which the separation pertains...."; *Gay Veterans Ass'n, Inc. v. Secretary of Defense,* 850 F.2d 764, 768 (D.C.Cir.1988) (to determine the characterization of service, weigh or balance the favorable and detrimental aspects of a service member's record). Also *cf.* Air Force Instruction (AFI) 36–3206, titled "Administrative Discharge Procedures for Commissioned Officers" (June 19 1998), at 111, 120 (look to the military record for the character of discharge); AFI 36–3207, "Separating Commissioned Officers" (Feb. 1, 1999), at ¶ 1.7 (base the character of discharge on a "pattern of behavior or duty performance or both"), ¶¶ 1.72, 1.73 (determine what character of discharge the military record warrants).

ter of discharge, as a matter of equity, was adopted by the Secretary of the Army). Under the circumstances of this case, the Board's review of Lieutenant Thomas' records, including evidence of dishonored checks in a letter of reprimand and of failure to maintain weight standards in performance reports, was not error.

As a final matter, as noted above, the plaintiff was provided with partial relief. Ms. Thomas was provided an Honorable discharge rather than a General discharge; her discharge was based on the completion of her active duty service commitment on June 7, 1994, rather than based on unacceptable conduct; and back pay was awarded. This relief was provided "as a matter of equity and as an exception to policy," over the objection of two board members. The equitable relief reflects the Army's careful consideration of the facts of the plaintiff's case. Plaintiff, however, argues that once the Board deemed relief to be proper on the claim, the Board was required to provide all of the relief she had requested, to include reinstatement, correction of records, and consideration for promotion. In support of her contention, plaintiff relies on *Denton v. United States,* 204 Ct.Cl. 188, 1974 WL 21682 (1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1949, 44 L.Ed.2d 449 (1975), for the proposition that "once an administrative body decides relief is proper on the claim and presentation then made, it should not be free to illegally or arbitrarily award less relief than that requested by the claimant in that proceeding." *Id.* at 195. The Court of Claims in *Denton,* however, continues:

> In the context of the correction of a military record, this means that once a discretionary decision is made to correct a record, the grant of appropriate money relief is not discretionary but automatic. If appropriate payment is not then made, a cause of action accrues in this court at that time. In this case, however, the appropriate payment has been made and plaintiff seeks only a new discretionary correction of his record.

*Id.* at 195–96 (citations omitted). Similarly, the record reflects that the appropriate payment has been made, the plaintiff having received back pay to the discharge date of June 7, 1994, reflecting completion of her active duty service commitment. Had plaintiff not received back pay to that date, *Denton* stands for the proposition that she should be so reimbursed. Had the Board's recommendation and the Secretary's decision been to reinstate plaintiff, and had she not received all of the back pay driven by that additional relief, *Denton* would support appropriate further reimbursement. Even the two members of the Board who recommended the partial relief adopted by the Secretary were clear, however, that "the applicant's overall record of service did not warrant consideration for promotion [or] continuation on active duty beyond her active service commitment date ...." The other two board members recommended that plaintiff receive no relief. The partial relief awarded this plaintiff does not violate the rule enunciated in *Denton,* as contended by plaintiff. *See also Bonen v. United States,* 229 Ct.Cl. 144, 666 F.2d 536, 539–40 (1981) ("[T]he 'half-a-loaf' doctrine normally applies where a corrections board grants plaintiff's claim, but stops short of awarding the full appropriate relief requested by plaintiff. Failure of the board to grant full relief where it is mandated by the records change results in [a claim]."); *Bruton v. United States,* 34 Fed.Cl. 347, 355 (1995) ("[The plaintiff] must show that the Board acted illegally or arbitrarily in not extending the effect of the expungement of the bar to reenlistment further to invalidate the discharge."), *aff'd,* 92 F.3d 1206, 1996 WL 383930 (1996) (table). In the instant case, the records change did not mandate reinstatement and, as noted earlier, the Board did not act illegally or arbitrarily in declining to recommend reinstatement of the plaintiff.

■ The Federal Circuit has held, in military pay cases, that an issue "is 'justiciable' only if it is 'one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence.'" *Voge v. United States,* 844 F.2d 776, 780 (Fed.Cir.1988) (quoting *Greene v. McElroy,* 254 F.2d 944, 953 (D.C.Cir.1958), *rev'd on other grounds,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988).

*Accord Adkins v. United States,* 68 F.3d 1317, 1322 (Fed.Cir.1995), *reh'g denied* (1996); *Murphy v. United States,* 993 F.2d 871, 873 (Fed.Cir.1993), *cert. denied,* 511 U.S. 1019, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994), *reh'g denied,* 511 U.S. 1118, 114 S.Ct. 2123, 128 L.Ed.2d 681 (1994); *Sargisson v. United States,* 913 F.2d 918, 922 (Fed.Cir.1990), *reh'g denied* (1990). On substantive decisions in military pay cases, courts normally defer to the specialized experience of military decision makers:

> The merits of a service secretary's decision regarding military affairs are unquestionably beyond the competence of the judiciary to review. *See, e.g., Orloff* [*v. Willoughby,* 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953)] ("While the courts have found occasion to determine whether one has been lawfully inducted and is therefore within the jurisdiction of the Army and subject to its orders, we have found no case where this Court has assumed to revise duty orders as to one lawfully in the service."); *Murphy* [*v. United States,* 993 F.2d 871, 874 (Fed.Cir. 1993)] ("[T]he merits of the Air Force's decision to release [this officer] from active duty are beyond judicial reach."); *Sargisson* [*v. United States,* 913 F.2d 918, 922 (Fed.Cir.1990)] ("A court lacks the special expertise needed to review reserve officers' records and rank them on the basis of relative merit."); *Doggett v. United States,* 207 Ct.Cl. 478, 482, 1975 WL 22827 (1975) ("We have repeatedly refused to interject ourselves into the discretionary military promotion process even if legal error was in some respect committed as to the complaining serviceman."); *Heisig* [*v. United States,* 719 F.2d 1153, 1156] ("[R]esponsibility for determining who is fit or unfit to serve in the armed services is not a judicial province...."); *Sanders v. United States,* 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979) ("Strong policies compel the court to allow the widest possible latitude to the armed services in their administration of personnel matters.").

*Adkins v. United States,* 68 F.3d at 1322–23.

■ The Federal Circuit in Adkins also reiterated the operative distinction between what is judicially reviewable and what is not:

> Not every claim arising from a military decision presents a nonjusticiable controversy.... This court has consistently recognized that, although the merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy. *See, e.g., Murphy,* 993 F.2d at 873 ("A court may appropriately decide whether the military followed procedures because by their nature the procedures limit the military's discretion."); *Dodson v. Department of Army,* 988 F.2d 1199, 1207 n. 7 (Fed.Cir.1993) (reviewing the procedural regularity of the challenged action, but not the substance of the Army's decision); *Sargisson,* 913 F.2d at 921 (although the "statute does not place any procedural or substantive limitations on the Secretary's discretion[,] once the Secretary promulgated regulations and instructions and made them the basis for [the challenged decision,] his action became subject to judicial review for compliance with those regulations and instructions." (citation omitted)); *Voge* [*v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988)] ("[T]he Claims Court may review the [challenged] process for compliance with established procedures."); *Koster v. United States,* 231 Ct.Cl. 301, 685 F.2d 407, 412 (1982) (finding jurisdiction to review procedural aspects of a decision of the Secretary of the Army, acting on behalf of the President). Other Circuit Courts of Appeals have recognized a similar distinction. *See, e.g., Watson v. Arkansas Nat'l Guard,* 886 F.2d 1004, 1011 n. 16 (8th Cir.1989) ("[A]djudication of [plaintiff's] claims requires the district court to determine only whether the Secretary's decision making process was deficient, not whether his decision was correct."); *Kreis v. Secretary of Air Force,* 866 F.2d 1508, 1511 (D.C.Cir.1989) (same).

*Adkins v. United States,* 68 F.3d at 1323 (footnote omitted; alterations in original). As noted earlier, whether the decision to involuntarily discharge the plaintiff was unduly harsh or appropriate under the facts is

not the province of the courts. The merits of the discharge decision are nonjusticiable. This court normally will not substitute its judgment for that of the proper military authorities on military personnel decisions, such as who will be retained in the military and who will be discharged. The court, however, has examined the plaintiff's various allegations concerning the lack of procedural regularity in this discharge action, including, for example, assertions that the plaintiff was denied the right to obtain statements to defend against the discharge action; that statements supporting her discharge may have been coerced; that racial animosity may have produced biased statement against plaintiff; that uncharged reasons may have been used improperly as a basis for her discharge; and that the partial relief recommended by the Correction Board and adopted by the Secretary was improper. As noted earlier, the plaintiff's assertions of procedural defects and the parties' submissions, including the administrative record, were examined at length and found either not to have been error, or to have been cured, such that the discharge action was not thereby tainted. With respect to her discharge, the plaintiff has not demonstrated with clear and convincing evidence that the military's determinations were unsupported by substantial evidence, or were otherwise arbitrary and capricious.

## CONCLUSION

The plaintiff has not overcome the strong presumption that the responsible military officials properly exercised their discretion to separate the plaintiff from the Army, and that Army officials discharged their duties in good faith. Nor has the plaintiff carried her burden of demonstrating with clear and convincing evidence that the ABCMR's decision was arbitrary, capricious, or unsupported by substantial evidence.

Therefore, based on a careful review of the record, and the arguments presented, the court, hereby, **DENIES** the plaintiff's motion for judgment on the administrative record, and **GRANTS** the defendant's motion for judgment on the administrative record. The Clerk's Office is directed to enter judgment in accordance with this decision. No costs shall be awarded.

**IT IS SO ORDERED.**